## COCHRAN and wife *vs*. VAN SURLAY.

*A private act of the legislature* authorizing the *sale of the estate of infants*, for their maintenance and education, is within the scope of the legitimate authority of a state legislature.

Such act is *constitutional*; it neither violates the provision of the *constitution of this state*, adopted in 1776, viz. that no member of this state shall be disfranchised or deprived of his rights, unless by the law of the land or the judgment of his peers; nor the provision of the *constitution of the United States* inhibiting the passage of laws *impairing the obligation of contracts*.

Where an act for the sale of the estate of infants required the *assent* of the *chancellor*, an *order for sale* to be made by him, and an *investment* of the proceeds, so as to secure to the infants at least the *principal* of the purchase money; and the chancellor in his order authorized the proceeds of the sale to be applied, among other things, *to the payment of the debts of the father of the infants*, and a sale took place and a conveyance of the property executed: *It was held* that, the chancellor *having jurisdiction* in the matter, no error committed by him in directing the application of the proceeds in a manner different from that provided by the legislature could affect the title of a *bona fide* purchaser, in *an action at law*, brought by the infants for the recovery of the property.

Where the order of sale authorized the trustee to *sell*, or to *mortgage* or to *convey the premises in satisfaction of any debt owing by him*, requiring, however, that every *sale*, and *mortgage*, and *conveyance in satisfaction*, should be approved by a master, by a certificate endorsed on the deed; and a *sale for cash* took place, and a deed was executed without the approval of the master obtained, *it was held*, by a majority of the court, that the *approval of a master* was necessary only in the third alternative, specified above, and that consequently the deed executed on a *sale for cash* was valid, notwithstanding the want of such approval.[*]

ERROR from the supreme court. This was an action of ejectment brought by *Isabella Clarke*, who after the verdict rendered in the cause married *R. J. Cochran*, after which the suit was prosecuted in their joint names. The plaintiff claimed to recover

---

[*] *Senator* VERPLANCK, in the opinion delivered by him in this case, controverts the position "that acts of the legislature contrary to the first principles of right," are void. He denies the power of the COURTS to *annul* an act of the LEGISLATURE, by declaring it void on the assumed ground of its being *contrary to natural equity;* and insists that such power can properly be exercised only when clearly derived from *express constitutional provisions,* (and those strictly construed, limiting legislative power and controlling the temporary will of a majority by a permanent and paramount law settled by the deliberative wisdom of the nation.

under a devise contained in the will of *Mary Clarke*, executed on the 6th April, 1802, whereby the testatrix gave a certain portion of a farm owned by her at *Greenwich*, called *Chelsea*, and also a house and lot then occupied by one Thomas Byron, to *Benjamin Moore*, and two other persons, *in trust*: 1. To receive the rents, issues and profits thereof, and to pay the same to Thomas B. Clarke, son of her late son Clement, during his natural life; 2. From and after the death of Thomas B. Clarke, to convey the premises to his *lawful issue*, in fee ; and 3. If he should not have lawful issue, then to convey the premises to *Clement C. Moore*, a grandson of the testatrix, and to his heirs. Thomas B. Clarke died in 1826, leaving three children, and this action was brought by one of them, to recover the *third* of *three lots* of land, part of the portion of the farm at Greenwich, devised in trust as above stated. The *defendant claimed title* to the premises under a deed executed by *Thomas B. Clarke*, the father of the plaintiff, to *George De Grasse*, bearing date 2d August, 1821, whereby 39 lots, part of the Greenwich farm, and including the three lots in question, were, for the consideration of $2000, sold and conveyed to the grantee, who, on the 28th March, 1822, conveyed the 39 lots, with 4 other lots, to the defendant, for the consideration of $1200, subject to a mortgage of $1000, executed by De Grasse. The defendant claimed that Thomas B. Clarke was authorized to execute a *valid conveyance* of the property granted by him to De Grasse, by virtue of *certain acts of the legislature*, passed in reference to the property above specified ; and also by virtue of *certain orders of the court of chancery*, made under two of the said acts authorized and ratified by a subsequent act of the legislature. The first act passed upon the subject authorized the *partition* of the property at Greenwich into two moieties ; one moiety to be *subdivided into lots* and *sold*, together with the house and lot occupied by *Byron*, and the proceeds invested in stocks or real securities, for the purpose of *creating an income* for the benefit and support of Thomas B. Clarke, his family and children ; the *principal* to be paid after the death of Thomas B. Clarke, according to the trusts

Cochran *v.* Van Surlay.

of the will of Mary Clarke. This act was passed in 1814, upon the petition of Thomas B. Clarke, and with the concurrence of the *trustees* named in the will of Mary Clarke and of *Clement C. Moore*, the contingent remainder-man. In 1815, a further act was passed, reciting that Clement C. Moore, the remainder-man, had conveyed his contingent interest to Thomas B. Clarke, and then authorizing Clarke to do and perform every act in relation to the property which the act of 1814 had directed might be performed by trustees, to be appointed by the chancellor ; but no sale was to be made by Clarke, until he had procured the assent of the chancellor, and when a sale was made, the proceeds were to be invested, and an annual account of the *principal* rendered ; but the *interest* Clarke was authorized to apply to his *own use and benefit, and for the maintenance and education of his children.* In July, 1815, the chancellor made an order assenting to the sale of a *moiety* of the Greenwich property and of the *house and lot* occupied by *Byron*, and directed that the proceeds of the sale should be applied to the payment and discharge of the *debts then owing by Clarke and to be contracted for the necessary purposes. of his family,* and the residue placed at *interest* on real security upon trust that so much of the *income* as might be necessary should be applied to the suitable and proper maintenance and support of Clarke, his wife and children, and for the suitable education of his children, and that the *principal* should be held for the benefit of the *issue* of Clarke living at his death. In 1816 a further act was passed, authorizing Clarke, under the order theretofore granted by the chancellor or any subsequent order to be made, to *sell the premises* which the chancellor had permitted or might thereafter permit him to *sell*, and to apply the proceeds to the purposes required or to be required by the chancellor under the acts before passed by the legislature. In March, 1817, a further order was made by the chancellor, authorizing Thomas B. Clarke to *sell and dispose* of the southern moiety of the estate at Greenwich; also authorizing him to *mortgage* all or any part or parts of the said moiety, if in his judgment it would be more beneficial to mortgage than to sell the same ; and also authorizing

him to convey any part or parts of the said moiety in payment and satisfaction of any debt or debts due and owing from him, upon a valuation to be agreed on between him and his respective creditors, " provided nevertheless, that every sale and mortgage " and conveyance in satisfaction, that may be made by the said " Thomas B. Clarke in virtue hereof, shall be approved by one " of the masters of this court, and that a certificate of such appro- " val be endorsed upon every deed or mortgage that may be made " in the premises." The several statutes above referred to are to be found in the *Statutes, sess. of* 1814, *p.* 77 ; *sess. of* 1815, *p.* 91 ; *and sess. of* 1816, *p.* 57. On the trial of the cause the defendant offered to read in evidence a *certificate of approval* by a master, bearing date 5th March, 1832, endorsed on the deed from *Clarke* to *De Grasse*. The plaintiff objected to its being received in evidence, and the objection was sustained by the judge. A verdict was entered for the plaintiff by consent, subject to the opinion of the supreme court upon the facts to be presented in a case. Upon the case made the supreme court rendered judgment for the *defendant*. See opinion delivered by Mr. Justice *Bronson*, on giving judgment, 15 *Wendell*, 439, *et seq.* The plaintiffs sued out a writ of error, and the case was now presented in the form of a special verdict. The cause was argued here by

*D. B. Ogden*, for the plaintiffs in error.

*J. Anthon*, for the defendant in error.

*Points on the part of the plaintiffs in error.*

I. The acts of the legislature destroyed the will of Mrs. Clarke, the testatrix from whom the plaintiffs claim, and the vested rights under the will, and were therefore against the constitution of New-York. *Former Const. of State of New-York,* § 13.

2. The orders in chancery made, or supposed to be made under those acts, are for the same reason void.

Cochran *v.* Van Surlay.

3. The acts of the legislature are repugnant to that part of the constitution of the United States which declares that no state shall pass any law impairing the obligation of contracts. *Const.* *U. S. art.* 1, § 10.

4. The act of a legislature is void if it be the exercise of power against law and reason. 1 *Bay,* 252. *Van Horne* v. *Dorance,* 2 *Dallas,* 308.

5. In the acts of the legislature and orders of the court of chancery, the rights in remainder of the children of Thomas B. Clarke were not protected, because they were not represented by guardian before the legislature, or in the court of chancery. Clarke, as the father and general guardian of the children, could not represent them on these occasions. 2 *Black. Comm.* 345. *Catlin* v. *Jackson,* 8 *Johns. R.* 405.

6. The deed under which the defendant claims title is void, because it is not given in pursuance of the acts of the legislature and orders in chancery. The order in chancery required that a certificate of a master should be endorsed on the deed at the time of its execution and delivery, approving of the circumstances under which it was given. No such certificate was endorsed at such time. The subsequent certificate put upon the deed after the commencement of this suit, and the death of the grantor, is an evasion of the order, and a fraud upon the rights of the children.

7. The certificate endorsed upon the deed is an admission that the deed was given for debts contracted. If the deed had been given by Clarke as trustee on a cash sale, that important fact would have been made to appear.

8. The conveyance under which the defendant claims title, is a breach of trust. All grants from that source are vitiated by fraud. The first purchaser knowing that he was dealing with a trustee, was bound to look to the remainder rights of the children, and see that the trust was fulfilled.

*Points on the part of the defendant in error:*

1. The several acts of the legislature, having been enacted

Cochran *v.* Van Surlay.

with the express view of benefitting the infants, by procuring a maintenance for them from unproductive property, are valid. *Sinclair* v. *Jackson*, 8 *Cowen*, 543. 2 *Black. Comm.* 344, 345. *Cruise's Dig.* 33, *tit. Private Acts.*

2. The orders of the chancellor have in all things conformed. to the statute, and are obligatory.

3. The conveyance to De Grasse, under whom the defendant claims title, was a sale for a valuable consideration, under the chancellor's order, and conformed to it.

4. The certificate of a master was not necessary, according to the proper interpretation of the chancellor's order, to give validity to such a sale ; it is confined to conveyances in payment of Clarke's debts.

5. If such certificate was necessary to a sale for valuable consideration, no time being fixed in the order, a certificate obtained at any time after the sale, will satisfy the order of the chancellor ; and such certificate was obtained in this case.

6. Whether the orders conformed to the statute, and the deed to the orders, is a question for the chancellor, and not for the supreme court, he alone having power to compel the plaintiff to do equity by returning the consideration money, should he consider the deed to deviate from his order.

7. The supreme court cannot take cognizance of the matter without infringing on the exclusive jurisdiction of the chancellor.

After advisement, the following opinions were delivered :

By the CHANCELLOR. In the examination of this case it is proper to take into consideration the fact that we are acting as a court of law, and are endeavoring to ascertain whether the legal title to the premises is in the plaintiffs; for if it is not, then they cannot recover in this suit, whatever may be their equitable rights as against this defendant or any other person ; and if the legislature had the right to pass the acts in question, then it will not be necessary to inquire whether the original trustees were

guilty of a breach of their duty in consenting to improvident acts of legislation, in consequence of which the rights of these complainants may have been sacrificed. On the other hand, if the acts are unconstitutional and void, it is not in the power of this court, in an ejectment suit, to inquire whether the defendant has an equitable lien or claim upon the premises for the purchase money which has been applied to the support and education of Mrs. Cochran during her minority, or for any buildings or improvements which have been made upon the premises in good faith, under the supposed title acquired under the acts of the legislature and the orders of the court of chancery. The two questions proper for consideration in this suit, therefore, are, 1. Whether the legislature exceeded its constitutional powers in passing the acts of the 1st of April, 1812, the 24th of March, 1815, and the 29th March, 1816 ; and 2. If those acts were constitutional, whether they have been carried into effect, under the orders of the court of chancery, so far as to vest the legal title in the grantee of Thomas B. Clarke, under whom the present defendant claims.

If the laws are unconstitutional, it must be either because they impair the validity of a contract, and thus conflict with the constitution of the United States, or because they are inconsistent with the state constitution, in taking the property of infants and applying it to purposes not previously authorized by law, and which could not benefit them. There is not any contract which has been violated in this case by the legislature, within the meaning of that clause of the constitution of the United States which prohibits the state legislatures from passing any laws impairing the obligation of contracts. In the case of *Fletcher* v. *Peck*, 6 *Cranch's R.* 87, the supreme court of the United States decided that this prohibition in the constitution applied as well to rights vested under *executed contracts* as to rights under such as were *executory* merely ; and that the act of the legislature of the state of Georgia which attempted to divest the title to land which had been vested in the grantees of the state under the power conferred upon the governor, as its agent,

by virtue of a previous act authorizing such grant, was therefore unconstitutional as to *bona fide* purchasers who had acquired a legal title to the land under that grant. The language used by Chief Justice *Marshall*, in delivering the opinion of the court in that case, has been supposed by some to mean that every right vested in an individual or body corporate was in the nature of a contract executed; and therefore within the protection of this clause of the constitution; and certainly the strong language used by him, in that case, is calculated to convey that impression if his language be not carefully examined and applied to the case then under consideration. But that impression is entirely removed when we refer to a subsequent decision of the same court, pronounced by another of its members, but while that distinguished judge still occupied his seat on the bench. In the case of *Satterlee* v. *Matthewson*, 2 *Peters'* R. 380, which came before that court in 1829, on a writ of error to the supreme court of the state of Pennsylvania, the question arose whether a legislative act of the state changing the law, as it had been declared settled by the highest judicial tribunal of the state, in a suit between the same parties, was not, as to the party who had acquired rights under such decision of the court, a violation of this provision of the United States constitution. The supreme court of the United States there decided that. the provision of the constitution did not extend to vested rights which were not thus vested under a contract, the obligation of which was impaired or destroyed by the state law. In delivering the opinion of the court, in that case, Mr. Justice *Washington* says : " The objection, which was most strongly pressed upon the court, and relied upon by the counsel for the plaintiff in error was, that the effect of this act was to divest rights which were vested by law in *Satterlee*. There is certainly no part of the constitution of the United States which applies to a state law of this description; nor are we aware of any decision of this court or of any circuit court, which has condemned such a law upon this ground, provided its effects be not to impair the obligation of a contract, and it has been shown that the act in question has no such effect

Cochran *v.* Van Surlay.

upon either of the contracts which have been before mentioned. In the case of *Fletcher* v. *Peck,* it was stated by the chief justice that it might well be doubted whether the nature of society and of government do not prescribe some limits to the legislative power; and he asks, if any be prescribed, where are they to be found if the property of an individual, fairly and honestly acquired, may be seized without compensation? It is no where intimated in that opinion that a state statute which divests a vested right is repugnant to the constitution of the United States." After this decision of the court of dernier resort, upon a question as to the construction of the federal constitution, it would be improper for us, even if we should differ with that court in opinion, to declare the acts of the legislature in question in the present case void, on the ground that they were repugnant to that provision of the constitution of the United States.

But, as I have frequently had occasion to observe, an act of the legislature which would have the effect to divest an individual of his property and transfer it to others for their own benefit, without compensation, or where there was no reason to suppose the person whose property was thus taken would be benefitted thereby, and contrary to the settled principles of law, would be void, as being against the spirit of our state constitution, and not within the powers delegated to the legislature by the people of this state. It is clearly, however, within the powers of the legislature, as *parens patria,* to prescribe such rules and regulations as it may deem proper for the superintendence, disposition and management of the property and effects of infants, lunatics, and other persons who are incapable of managing their own affairs. But even that power cannot constitutionally be so far extended as to transfer the benefical use of the property to another person, except in those cases where it can legally be presumed the owner of the property would himself have given the use of his property to the other, if he had been in a situation to act for himself—as in the case of a provision out of the estate of an infant or lunatic, for the support of an indigent parent, or other near relative. Testing the legislative acts in question by these

rules, I cannot see that they infringe either upon the letter or the spirit of the state constitution, so far as the rights of the children who were in existence at the time of the passage of those acts were concerned. It is true, that by the terms of Mrs. Clarke's will, the children of T. B. Clarke, then in existence, had only a contingent interest in the remainder of the estate after his death ; or rather it was a vested remainder subject to open and let in after born children, and which was liable also to be divested by the death of the children during the lifetime of their father. It was, therefore, contrary to the settled principles of *law* to authorize a sale of the contingent interests of persons not then in existence, for the purpose of providing a maintenance for those who might not eventually be entitled to any interest in possession in such remainder.

But it is a settled rule of the *court of chancery*, that where a future estate or interest in property is given to several infants as a class, with the right of survivorship as between themselves, a provision for the maintenance of each may be allowed out of the fund, although, as in this case, it may eventually be found that some of them do not become entitled to an interest in the fund in possession, and that the whole belongs to the survivors. The principle upon which the court proceeds, in such a case, is, that although it may eventually turn out that some of the children may not be entitled to any portion of the fund, yet as the chances of survivorship are equal, no injustice can be done to either, by providing for the present support of all out of a fund which presumptively belongs to all in equal proportions. But where, by the provisions of the conveyance or will, under which the property or fund is held, other persons may eventually be entitled to such fund or property, it cannot be taken and applied to the support of those who are presumptively entitled to the same, without the consent of those who may become entitled to the same under such contingent limitation. *Ex parte Kebble,* 11 *Vesey,* 604. *Canning* v. *Flower,* 7 *Sim. R.* 523. And where the contingent limitation over is to persons not in existence, or whose consent cannot be obtained, the fund cannot be appropriated for the

support of those who are only presumptively entitled to the same, and whose interest therein may never vest in possession. *Errat* v. *Barlow*, 14 *Ves. R.* 202. *Turner* v. *Turner*, 4 *Sim. R.* 430. For this reason, the chancellor was not authorized to direct a sale of the interest of the children of T. B. Clarke in the property in question, for their maintenance and education, under the *general act concerning infants*, *Laws of* 1814, *p.* 128, unless the purchaser was willing to take the title, subject to the contingent rights of other persons who might eventually become entitled to an interest in the premises under the limitations in the will of Mrs. Clarke ; and as the value of such contingent interests could not be ascertained by any known rule of compensation, the chancellor would not authorize a sale, unless the purchaser would pay the full value of the property, subject to the father's life estate, and without reference to such contingent interests. For the same reason, the legislature probably could not by these special acts authorize a sale of the property, so as to affect the contingent rights of persons not then in existence, who might thereafter become entitled to the same, under the limitations in the will. Were the rights of any such persons now in controversy in this cause, there might be some reason to doubt the constitutionality of these acts of legislation, so far as *those rights* were affected thereby ; but, as in the event which has occurred, no persons, except three of the children who were in existence at the time these acts were passed, became entitled to any interest in the remainder limited upon the life estate of *T. B. Clarke,* those children cannot legally complain that the legislature passed laws which might have been unconstitutional as to other persons, in a different event. In testing the constitutionality of these acts in reference to the rights of the plaintiffs in error, the case is to be considered in the same light as if the limitation of the remainder had originally been to the six children in fee, with a right of survivorship in favor of such of them as should be living at the termination of the life estate of their father ; in which case, as we have before seen, the court of chancery might apply a fund in which all had an equal interest, presumptively, for the com-

mon and equal benefit of all. Indeed, it is a settled principle, that whenever the property of infants consists of real or personal estate, the legal title to which is in *trustees*, the chancellor, as the general guardian and protector of the rights of all infants, may authorize such a disposition thereof, as he in the exercise of a sound legal discretion, may deem most beneficial to such infants, provided the rights of other persons are not prejudiced thereby. The only restrictions upon that power, are those which the court has from time to time imposed upon itself, in the nature of general rules to regulate the exercise of such discretion, and those imposed by certain provisions of the Revised Statutes rendering trustees incapable of transferring the title to trust estates, in contravention of the trust expressed in the instrument creating such estates. The same power is given to the chancellor over the legal estates of infants by the several acts in relation to the sale of infant's estates, subject, however, to the limitation imposed by the legislature, that such estates shall not be sold or disposed of contrary to the provisions of the will or conveyance, by which the estate was devised or granted to the infant. It seems therefore to follow, as a necessary consequence, that the legislature must have the constitutional power to pass special laws authorizing similar dispositions of the estates of infants for their benefit, either with or without restriction, where an infant or class of infants are entitled to the whole beneficial interest in the property, especially where such disposition is directed to be made under the superintending control of the court of chancery.

I do not find any thing in the special verdict to justify the allegations of counsel, that these acts were not for the benefit of the infants, but for the benefit of T. B. Clarke merely. As the father, where he is of sufficient ability, is bound to support his infant children, if it had been found by the special verdict that T. B. Clarke had ample means for that purpose, then it certainly could not have been for the interest of the infants that their future estate in the property should have been sold and applied to that use, and the trustees, in that case, would probably have

been guilty of a breach of trust in consenting to the passage of an act of the legislature authorizing such a sale, in case the infants eventually sustained any damage in consequence thereof; but it is stated in the act of April, 1814, that it appeared to the legislature that the property devised to the trustees was nearly unproductive, and that in its then situation it was incapable of being improved, so as to yield an adequate income for the support of T. B. Clarke and his family, whereby the intentions of the testatrix would be defeated without the interposition of the legislature; and this statement must be taken as true, until the contrary is found to be the fact. It is a matter of public notoriety, that a life estate in vacant city lots is of compartively little value, and frequently is not equal to the taxes and extraordinary assessments charged thereon. We may therefore readily imagine that the owner of such an estate was unable to support himself and wife, with six children, out of the income thereof, and that he might be compelled to encumber his life estate to furnish the means of support. The act of 1814, therefore, appears to have been a very proper exercise of the legislative power, and the acccumulating fund provided for by the third section of the act, I presume, afforded an ample equivalent for the part of the future estate of the children which was taken for the immediate support of themselves and their parents. By that act the trustees were discharged, and the legal title to the premises was to vest in the new trustees to be thereafter appointed by the court of chancery. By the first section of the act of March, 1815, the equitable life estate of T. B. Clarke in the premises was converted into a legal estate, which was perfectly proper, as its conversion from an equitable to a legal estate could not possibly affect the rights or interests of any other person. And although it might not have been a discreet act of legislation to vest the legal title of the residue of the trust estate in T. B. Clarke, as is done by the operation of the second section of that act, no one can say it can have been an unconstitutional exercise of power, even if his general powers, as trustee for his infant children, had not been expressly restricted by the super-

intending power and control of the chancellor, and by requiring the assent of that officer to any sales to be made.

But it is supposed that the act of March, 1816, is liable to the constitutional objection that it sanctions the order of the chancellor which appropriated the proceeds of the children's property to pay off debts of the father, and which were not contracted for their benefit. I cannot perceive, however, that the order is liable to that objection. It is true the mortgage to the Manhattan Company, given in 1805, could not have been given for a debt incurred for the support and maintenance of children who were born long afterwards; but it must be recollected that T. B. Clarke had himself a life estate in the whole premises, which might legally and properly be taken for the purpose of paying the debts then due to his creditors, although no part of those debts were contracted for the support or education of his infant children; and unless such debts exceeded the value of his life interest in the premises, it was not improper to direct them to be paid out of the proceeds of the sale of the premises; as the proceeds of the life estate of the father could not be taken and appropriated for the support of his children, to the prejudice of the rights of creditors who had a prior claim to his property. The jury have not, by their special verdict, found that the order of the chancellor had the effect to take the proceeds of their future interest in the property, and to apply the same in payment of the father's debts, without giving to them a corresponding benefit, in the support which they thereby obtained out of the income of his life interest in other parts of the property; we therefore cannot presume that the court of chancery made an order which would produce that result, or that the legislature intended to authorize or sanction such an order.

If the chancellor, in the exercise of a proper power confided to him by the legislature, for the purpose of protecting the rights of those who were infants and incapable of taking care of their own rights, has not exceeded his jurisdiction, but has merely erred upon the question whether such sale as he authorized would eventually be for their benefit, Justice *Bronson,* who delivered the opinion of the supreme court, was clearly right in supposing

Cochran v. Van Surlay.

that the decision of the court of chancery could not be reviewed in this collateral way. By the act of 1815, Clarke was authorized to sell and convey the legal title and the beneficial interests of the children in the remainder, as well as his own life estate in the premises, with the assent of the chancellor; and if that assent was given to the sale to De Grasse, those claiming under the conveyance to him have a valid title to the premises in question, which certainly cannot be disturbed at law.

The only doubt I have had in this case, was upon the question whether, by the order of the 15th of March, 1817, the chancellor did not intend to require *every sale for cash* to be approved by a master, *as well as sales* or conveyances which might be made by the trustee *in payment or satisfaction of debts*. Upon this point I concur, though with some hesitation, in the conclusion at which the justices of the supreme court arrived, that the restriction was only intended to apply to sales and conveyances in satisfaction of debts at a valuation to be approved of by a master, according to the prayer of the petition upon which that order was founded. The legal title to the premises in this case, therefore, passed to the purchaser thereof for cash, although the conveyance from Clarke, as the substituted trustee under the statute, was not approved of by a master, as it should have been if the property had been conveyed to a creditor of the trustee in discharge of a debt due from the latter.

For these reasons I shall vote for an affirmance of the judgment of the supreme court.

By Senator VERPLANCK. The first ground upon which the plaintiffs in error seek to avoid the sale made by Clarke under the several acts of the legislature, is their alleged unconstitutionality : 1. as against the former constitution of this state, under which they were passed ; and 2. as repugnant to the provisions of the constitution of the United States, which inhibits every state from passing any law impairing the obligation of contracts. I concur with the supreme court in supporting the constitutionality of the acts under which the sale, now impeached, was made. The first two acts, certainly and clearly, and the third one upon

the face of it, and as far as a natural and obvious construction would carry it, go no further than the exercise of that paternal power over the persons and property of infants, which under the common law was an inherent right of sovereign power, and may be exercised either by general laws, or, under peculiar circumstances, by special legislation. The chancellor has, without the aid of positive legislation, a large jurisdiction over the property of infants, to be exercised for their benefit ; and this jurisdiction, as was said by Lord Chancellor Hardwicke, in *Butler* v. *Traver*, *Ambler*, 302, "is a general right delegated by the crown, as *pater patriæ*, to interfere in particular cases for the benefit of such as are incompetent to help themselves." This doctrine, I know, has been recently called in question, but certainly without good reason, since Lord Redesdale, adding his own high authority to that of the long succession of English chancellors, says, "Lord Chancellor Somers, Lord Chancellor Northington, Lord Chancellor Hardwicke, and *every* other chancellor, has placed the jurisdiction on that ground." Whilst our own Judge Story thus sums up the discussion : " The doctrine now maintained is, that the general superintendence and protective jurisdiction of the court of chancery, over the persons and property of infants, is a delegation of the rights and duties of the crown." 2 *Story's Comm. Eq. Law*, 565. The same power, then, which the sovereign authority has a right to delegate generally, it may certainly exercise specially in the discretion of its officers ; for the authority is not judicial, but rather parental or tutelary. The same constitutional authority which empowered our state sovereignty to pass general laws for the management of infants' estates, such as have been heretofore enacted, and now form in another shape, a part of our revised code, could not but be competent to legislate for a particular case in which there occurred the same difficulties ; which becoming more common, were afterwards more widely guarded against by laws of universal application. They contemplated only a change of unproductive real estate into productive personal property, the income of which was to be applied to the benefit of all interested therein. The last act authorized

Cochran *v.* Van Surlay.

Clarke to sell the property, with the permission of the chancellor, and to apply the proceeds " to the purposes required or to be required by the chancellor under the former acts." The chancellor had already authorized the application of a part of the proceeds to the payment of Clarke's former debts. This order seems to me repugnant not only to the letter and intention of the devise, but also to the former acts, and in derogation of the rights of the infants. I should therefore think that it was not confirmed by the third act, which did not recite or confirm *eo nomine,* any particular order, but looked only to orders in conformity with, or " under the acts heretofore passed" on this subject, both of which limited the application of the money to the support of Clarke and his children, from the *interest* only. If this construction be correct, there can be no question as to the constitutionality of the acts, and the question will be as to the conformity of the orders with them.

But the words of the third act may admit of a broader construction, and such an one the chancellor appears to have given to them at the time of his last order. They may, perhaps, be construed as confirming expressly the order before granted, whether in conformity with the former acts or not, and thus authorizing the application of the *principal* of monies, which those acts reserved for the ultimate benefit of the children, to the payment of past debts of the father. This, however unwise or unjust it might have been, would not, in my view, shake the constitutionality of the act itself, according to the old constitution of 1776, under which it was passed. The only clause in that constitution which is alleged to bear upon the question, is that which declares that " no member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to the subjects of this state by this constitution, unless by the law of the land or the judgment of his peers." I must say with Mr. Justice *Bronson,* (even taking the operation of the act most strongly as depriving the infants of a portion of their property,) that I cannot see that they are deprived of any right expressly secured to them under that constitution. It is difficult, upon

Cochran *v.* Van Surlay.

any general principles, to limit the omnipotence of the sovereign legislative power, by judicial interposition, except so far as the express words of a written constitution give that authority. There are indeed many *dicta*, and some great authorities, holding that acts contrary to the first principles of right are void. The principle is unquestionably sound, as the governing rule of a legislature, in relation to its own acts, or even those of a preceding legislature. It also affords a safe rule of construction for courts, in the interpretation of laws admitting of any doubtful construction, to presume that the legislature could not have intended an unequal and unjust operation of its statutes. Such a construction ought never to be given to legislative language, if it be susceptible of any other, more conformable to justice; but if the words be positive and without ambiguity, I can find no authority for a court to vacate or repeal a statute on that ground alone. But it is only in express constitutional provisions, limiting legislative power and controlling the temporary will of a majority, by a permanent and paramount law, settled by the deliberate wisdom of the nation, that I can find a safe and solid ground for the authority of courts of justice to declare void any legislative enactment. Any assumption of authority beyond this, would be to place in the hands of a judiciary, powers too great and too undefined, either for its own security or the protection of private rights. It is, therefore, a most gratifying circumstance to the friends of regulated liberty, that in every change in their constitutional polity, which has yet taken place here, whilst political power has been more widely diffused among the people, stronger and better defined guards have been given to the rights of property. Thus in the constitution of the United States, the states have been inhibited from passing any law impairing the obligation of contracts, a power boldly, rashly and wantonly exercised under the old confederation. So again, in the constitution of our own state adopted in 1822, in addition to the general provision of the old constitution already quoted, " that no one shall be deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or

Cochran v. Van Surlay.

the judgment of his peers," farther protection is given to property, by adding a prohibition against " the taking private property for public use without just compensation," and also another against "the depriving any one of life, liberty or property, without due process of law :" i. e. by mere arbitrary legislation, under whatever pretext of private or of public good.

Believing that we are to rely upon these and similar provisions as the best safeguards of our rights, as well as the safest authorities for judicial direction, I cannot bring myself to approve of the power of courts to annul any law solemnly passed, either on an assumed ground of its being contrary to natural equity, or from a broad, loose and vague interpretation of a constitutional provision, beyond its natural and obvious sense.   There is no provision of the old state constitution, that, in my understanding of it, so limits the power of the legislature over the property of its citizens, as to enable a court to set aside these statutes, or titles acquired under them, on the ground of unconstitutional enactment.   The words of our present constitution are stronger, and under them the result might be different.   Nor can I consider the clause of the constitution of the United States, inhibiting any state from " passing any law impairing the obligation of contracts," as bearing upon these acts.

I am well aware that the language and reasoning of Judge *Story*, in his justly celebrated opinion in the great *Dartmouth College cause*, gives an extension to the meaning of the word *contract*, which might perhaps authorize its application to a case like that before us.   Such, however, is not the doctrine of Chief Justice *Marshall* or of his brethren, nor do any of the decisions of the supreme court of the United States under this head of constitutional law, rest upon or involve so latitudinarian a meaning.   I cannot consider the word *contract* as applying to such a transaction as that upon which the plaintiffs here rest their title, without giving to it an extent of meaning wholly unwarranted by any legal or even any colloquial usage.   A *contract* necessarily implies some reciprocity between the parties ; some mutuality of compact between them.   But a will absolute in its terms, and unconditional, cannot, by any stretch of terms within the

limits of legal or of ordinary language, be termed a contract ; still less can an estate absolutely vested under a decree, or if contingent yet contingent only on the casualties of life, not on any condition to be performed, be considerrd as an executed contract.   If such interpretation be allowed, there can be scarcely any state legislation which will not be in danger of being impeached and set aside for unconstitutionality, as touching, something that has at some past time or other been the subject of an executed contract. Viewing, as I do, this provision of our federal constitution and the series of wise and salutary decisions under it, as forming the most important safeguard of the rights of industry and labor possessed by the American citizen, I hold that sound political wisdom, not less than correct legal interpretation, should forbid us to  press the words of the constitution beyond their original obvious and settled meaning; and thus to make that prudent and useful check upon legislative indiscretion, odious to the people, by seeking to cover with it the whole of state legislation, and embarrassing its most ordinary and most beneficial operations. Under any view of the private acts in question, I conclude that they were within the constitutional legislative authority ; censurable, perhaps, for want of due caution, but not impeachable for usurpation of power.

The next points of inquiry are, whether the orders of the chancellor empowering the sale by Clarke were not void for want of conformity with the statutes ; and if they did not conform to the acts, whether the sale under them was not a nullity ?

I have already intimated my strong impression (at least as at present advised) that the orders were not in conformity with the acts, and that the third act still confined the chancellor to allow no other application of the proceeds of the sale than was valid under the " acts heretofore passed."   But, nevertheless, I am of opinion that the orders were so far valid as to protect a *bona fide* purchaser at a sale made in conformity with them, and to bestow upon him a legal title not to be impeached in a court of law.   Beyond this, I cannot go, nor does the case demand it. The order made under the first two acts, was in contravention of the statutes, so far as it allowed a part of the proceeds of the

Cochran *v.* Van Surlay.

sale to be applied to the payment of Clarke's former debts; nor do I think that the words of the act of 1816, ratified the former words or extended the chancellor's powers in future orders as to the liberty of applying the principal of those funds, of which, according to the " acts heretofore passed" on this subject, the *interest* only was to be expended.   But Clarke was clearly and directly empowered under the second and third acts to sell the property, after being permitted by the chancellor, or having procured his assent.   If, then, he procured the chancellor's assent to the sale, however erroneous the order granting that assent might have been as to the application of the proceeds of the sale, I cannot see how the title acquired under such a sale is to be impeached in a court of law, on the ground of erroneous application of the proceeds.   The question of application belongs to the peculiar jurisdiction of equity, and cannot be judged collaterally in a court of law, so as to overthrow indirectly and consequentially a legal title connected with it.   The old equity doctrine of application, which required purchasers from trustees to look to the application of the moneys paid by them at the hazard of losing the estate, or paying the consideration twice over, was long ago allowed to be hard and unjust, and recently has been weakened by repeated decisions limiting its extent or explaining away its force ; " equity struggling, as has been well said, against its own inequitable rule."  In this state, the recent revision of our laws has expunged the rule from our system.   This legislative alteration however cannot, as such, affect the present case.   But in its largest and most unrestrained acceptation, this rule could never have been carried so far as to make the *bona fide* purchaser's estate, not only dependant upon his seeing that the proceeds of the trust fund went to the person or purpose held out by the court as entitled to receive it, but moreover further dependant upon the right judgmnet of the court in its decision or its order as to the proper person or purpose entitled to such beneficial interest.   Such a distinction would have gone very far to make every sale under the authority of chancery, doubtful and hazardous.   What Lord Redesdale has said, in reference to the effect

of a decretal order, may, for the same reason, be extended to all
sales under the authority of the court.    " The general impression
of all the cases on this head is, that the purchaser has a right to
presume that the court has taken the steps necesary to investigate
the rights of parties, and that it has on investigation properly
decreed a sale." 1 *Sch. & Lef.* 597. Whether or no the
purchaser's title under such a sale must be protected absolutely
and conclusively, both at law and in equity, or (as I rather think)
whether equity might not review the whole transaction and vacate
the sale on the return of the purchase money, so as to protect
only against actual loss, I am not prepared to say, nor are we
called upon to decide.   But as the difficulty arises from error in
a court of equity, it is in equity alone that the remedy must be
sought.     Merely to vacate the sale and invalidate the title
acquired under it, in a court of law, would be but to inflict an
additional and inequitable hardship upon a new party, by attempt-
ing to shift the loss from one innocent sufferer to another, even
if that power were within the competence of a court of common
law.   But it is not within such jurisdiction.   All these private
acts clearly and unequivocally give the right to sell the real
estate with the permission of the chancellor ; and that authority
of sale seems to me good in law, whatever may have been the
judicial error in directing the subsequent application of the pro-
ceeds.   If such error has occurred, and if it can be corrected at
all at this period, it is to be corrected only by equity reviewing
its own orders, either in the same or a higher court, and adjusting
the loss among the several sufferers in their just ratio.   I have
thus far been led to the very same conclusions on the points
under examination with the supreme court, by a course of rea-
soning somewhat different from theirs, though not in contradiction
to it.    On the last point I am compelled to differ altogether
from their decision.

The sale and conveyance under which the defendant claims
title, are impeached as wholly void, because not made in confor-
mity with the express directions of the chancellor in his order.
I cannot but consider this objection fatal to the legal title of the

defendant, as it now stands. By those acts, as was justly said by the then chancellor, in a case arising under them, " the chancellor was virtually made the trustee of the property," *Sinclair* v. *Jackson*, 8 *Cowen*, 543 ; and no sale, mortgage or conveyance, was valid without his express assent or permission. In his order of March, 1817, he directs in three successive sentences : 1. That Clarke be authorized to *sell* certain property therein described : 2. That he be authorized to *mortgage* said property ; and 3. " The said Clarke is further authorized to *convey* any part thereof in payment or satisfaction of any debt due from him, on a valuation to be agreed upon between him and his creditors, provided, nevertheless, that every *sale*, and *mortgage*, and *conveyance* in satisfaction, that may be made by the said T. B. Clarke in virtue thereof, shall be approved by one of the masters of this court, and that a certificate of such approval be endorsed upon any deed or mortgage that may be made in the premises." Here the words *sale*, and *mortgage*, and *conveyance* in satisfaction, refer directly to the several authorities successively granted to sell, to mortgage, and to convey ; whilst, again, the words " deed or mortgage," must be referred to all the prior sentences, or the word "mortgage" has no effect at all. So Clarke was no where authorized to mortgage in satisfaction of debt. For all these powers the approval of a master is necessary, or the power is not granted. Judge Bronson, in pronouncing the opinion of the supreme court, rests the decision of this part of the cause upon rendering the words "in satisfaction of debt," as applying to each member of the whole preceding phrase, so as to mean every sale in satisfaction, every mortgage in satisfaction, every conveyance in satisfaction, whilst the whole proviso has no reference beyond the sentence which it immediately follows. He therefore regards Clarke as having an *absolute power* to sell or mortgage, and only *limited* by requiring the master's assent, to *convey in satisfaction of prior debts.* I must regard this interpretation as in direct hostility with the spirit and intention of the will, and the acts of the legislature, and equally so to those of the chancellor's order ; who would obviously require the

same guards against an abuse of trust in a sale for cash, or a mortgage, as in a conveyance in satisfaction of debt. Such an interpretation would, therefore, not be probable, was the language ambiguous or doubtful; but I see no doubt or ambiguity in the order. According to the most clear and obvious use of language, the approval of the master is made a necessary condition to every alienation in any way, or for any purpose. It is a plain question of the meaning of words, in respect to which every man must judge for himself. Differing so widely in my understanding of this meaning from the deliberate judgment of the learned court, I cannot speak with the unqualified confidence which I should, had it been presented as a new question; but still, for myself, I must say, with strong disposition to protect if possible the rights of an innocent *bona fide* purchaser, I have not been able to perceive the slightest color for the meaning given by the supreme court. If this understanding of the order be correct, then the sale by Clarke was a nullity without such an approval by a master. Looking merely to the parties, it is a nullity, because it wants the assent of the chancellor, (the virtual trustee) through the officer whom he substitutes to himself. Looking to the conveyance, it is void for want of the performance of that condition precedent which was made essential not merely to the commencement of the estate, but to the very creation of the power of sale.

Nor can an approval by a master with his certificate thereof given eleven years after the conveyance by Clarke, and five years after his death, (when the title had vested in his lawful issue living at his decease) in my opinion aid the legal title under such conveyance. The long interval of time which had elapsed, the death of Clarke, the change in the value of property, would throw doubt upon the transaction, and require explanation and other evidence to support it, were the certificate adduced to enforce an equitable claim for perfecting a title. But we are reviewing the decision of a court of law, and cannot look beyond the legal title as it now exists. In order to obtain a legal authority to sell, I think it was absolutely necessary that Clarke

should have his contract of sale approved by a master. He neither obtained such approval, (as far as appears) at the time when it ought properly to have been obtained, nor subsequently during his lifetime. No title, therefore, passed at the time by his conveyance, and on his death the legal title passed to his children, by the operation of the devise and our statute of trusts ; nor can that title be divested in a court of law by a subsequent approval of a master ; especially after claim of the lands and commencement of a suit for their recovery. It is, indeed, possible that the sale might have been approved at the time, and from some neglect the proper evidence required, not duly endorsed on the deed. Of this, we have no evidence, nor if we had, could the court below take cognizance of it. But if such were the fact, it would form one of those cases of defective execution which equity could relieve, and equity alone. If the defendant has such a protection to her title, she must go to chancery to give it validity and effect.

As the case now stands, I am of opinion that the judgment of the supreme court should be reversed, on the single ground that the sale and conveyance by Clarke not having been approved by a master until years after his death, when the title had passed to the present plaintiffs, were void and inoperative.

On the question being put, *Shall this judgment be reversed ?* *seven* members of the court voted in the *affirmative,* and *twelve* in the *negative.*

Whereupon the judgment of the supreme court was AF-FIRMED.