RICHARD H. BRADFORD, APPELLANT, VS. RICHARD A. SHINE, ADMINISTRATOR, APPELLEE.

1. The Legislature may repeal a statute limiting the time for commencing civil actions, and thus deprive a party of the right to plead the statute as a defence.

2. The law provides that all debts and demands against the estate of any testator or intestate, which shall not be exhibited within two years after notice given to that effect by the executor or administrator, shall forever afterward be barred : *Held*, that the repeal of this statute, after the expiration of the time so limited, does not revive the right to prosecute the claim, nor deprive the representative of a deceased person of his right to plead the bar, the right of action being extinguished in such case.

3. The Constitutional Convention of 1865 ordained, and the ordinance was incorporated in the constitution, " that no law of this State providing that claims or demands against the estates of decedents shall be barred if not presented within two years, shall be considered as in force within this State between the 10th January, 1861, and the 25th October, 1865 :" *Held*, that the convention of 1865 was called for the purpose of amending the constitution of the State to conform to the then existing political condition of the country, and not for purposes of general or special legislation, and that the provisions of such an ordinance could have no legal force.

4. The statute of December 13th, 1861, suspended the statute of limitations then in force " in relation to civil actions :" *Held*, that this suspension applied only to *civil actions*, according to the ordinary legal and popular signification and understanding of the terms, and did not apply to the presentation of claims against the estates of deceased persons.

Appeal from Leon Circuit Court.

A statement of the case is contained in the opinion of the court.

*A. L. Woodward, Sr.*, for Appellant.

1. *Pleading and Practice.*—Judicial doctrines on the subject of special pleading, originating in the English system, cease to be authoritative when that system has been superseded or essentially modified.

26

2. Where a demurrer is an implied admission of facts, on which it raises a question of law, the determination of that question is necessarily conclusive, for it would be absurd to proceed to the investigation of issues which the demurrer has absorbed.

3. Under our statutes, it is the *reserved right* of a party to resort to a trial, even of issues of facts, to which his demurrer had been addressed, after it has been overruled. Thomp. Dig., Title Pl., p. 331, sec. 7 ; Blount's Code Pl. and Pr., Act Jan., 1861, sec. 34.

4. If it were the object of the statute first cited to simplify the rules of special pleading and soften down the rigid and arbitrary rules of the common law, (1 Fla.,) then "*a multo fortiori*," does Blount's congenial Code exhibit the English system in a lively series of dissolving views.

5. A reargument has been applied for in this case because the cause was remanded, when it is said the judgment should have been in bar, as the plea of *plene administravit* was held good on demurrer.

By the common law, and by the earlier practice of this court, the judgment should have been in bar, but upon full consideration a different practice has been adopted as best comporting with a fair construction of our statute. 1 S. & M., 351.

6. Where a demurrer to a plea is overruled, it is error to render the judgment *final*—it should be *respondeat ouster*. 7 S. & M., 404, 408.

7. It is now the settled practice of this State that where a demurrer to a plea is overruled, the judgment of the court, instead of being *final* must be *respondeat ouster*, and when entered final by the court below, it will be reversed and remanded by this court. 12 S. & M., 439–44.

The question arising on the motion of the appellee is whether it is competent to an appellate court to enter an order *respondeat ouster*, on affirmance of the judgment of a Circuit Court overruling plaintiff's demurrer to defendant's

plea in bar, or whether the judgment of the appellate court must necessarily be *final and conclusive.*

The answer to this question must be found in " a practice best comporting with a fair construction of our statute."

*R. B. Hilton* on same side.

The statute set up as a bar to the plaintiff's suit was suspended by the act of December 13, 1861, (Pamph. Laws 1861, p. 18,) and has never been revived. Section 3 of that act reads as follows : " That the statutes of limitations now in force in this State, in relation to civil actions of every description, be and the same are hereby suspended," &c. The act in Thomp. Dig., p. 206, limiting the bringing of suits against executors and administrators, is clearly a statute of limitations—manifestly so regarded by the author of the digest, Judge Thompson, who, in framing his index, (see p. 656,) places *that* act *first* in the list of the statutes of limitations of this State. By referring to the appendix to Angell on Limitations, it will be seen that he too classes this among the Florida statutes of limitations, and in the same way classes all similar acts of other States.

So in all the books of reports and cases which I have been able to consult, statutes barring suits against estates, unless brought within certain limited time, are termed and treated as statutes of limitations. The cases on this point are too numerous for citation.

Judge Story, in Prat *et al.* vs. Northam *et al.*, 5 Macon, 95, says : " This *statute of limitations,* as to executors and administrators, is not created for their own security or benefit, but for the security and benefit of the estates which they represent." Thus this great judicial authority characterizes a statute like that on p. 206 Thomp., as a "statute of limitations." See 2 R. I., 196 ; 31 Mo., 260 ; 1 Denio, 159 ; 11 N. H., 208.

In some of these cases the distinction is drawn between the general statutes of limitations and these special statutes

limiting the period of suits against estates, but all alike are treated as statutes of limitations.

Our own Supreme Court says, in so many words, that the statute limiting actions against executors and administrators " is virtually a *statute of limitations.*" 3 Fla., 105.

Neither class of statutes extinguishes the debt. That no statute of limitation ever does. They simply, after the lapse of a certain time, if suit is not brought within that time, take away the remedy by closing the judicial tribunals to its prosecution. 18 Ala., 251 ; 2 Kansas, 156 ; 3 Kansas, 507 ; 13 East, 449 ; 17 Mass., 55.

Both classes of statutes in this State were suspended by the act of 1861, and still are.

But if the foregoing position be not tenable, then I rely upon the ordinance of 1865. It is, however, objected that this ordinance is invalid, because in conflict with the constitution of the United States. I ask, with what clause of that instrument is it in conflict ? To this question in the court below there was no answer, other than that it is an attempt to impair vested right. I reply, " a debtor cannot be said to have a vested right to a mere statutory defence." 6 Pick., 501 ; 37 Vt., 605. And furthermore, " there can be no vested right to avoid the payment of a just debt." 2 Kansas.

If it be insisted that the ordinance is in conflict with the constitutional provision for the protection of contracts, I reply, in the language of Mr. Justice Washington in delivering the opinion of the Supreme Court in Satterlee vs. Mathewson, 2 Peters, 412, " It is not easy to see how a law which gives validity to a void contract can be said to impair the obligation of that contract."

But suppose it be granted that the operation of this ordinance is to impair *vested rights*, that does not bring it in conflict with the constitution of the United States. It has been repeatedly held by the Supreme Court that nothing in the constitution of the United States prevents a State from

passing a valid law to divest rights which have been *vested* by law in an individual, because this was not a contract.  2 Peters, 412; 8 ib., 89, 540; 10 How., 375.

In the case of Lencalle vs. Battell, 6 Wend., 475, it was decided that a law of a foreign State, Denmark, authorizing proceedings calling on creditors to present their demands against a debtor by a specified day, and declaring the effect of omission to be not only to take away the remedy but to extinguish the debt, will be considered in the nature of a statute of limitations affecting the remedy and not the validity of the contract.

In Satterlee vs. Mathewson, the court says : " There is no part of the constitution of the United States which applies to laws divesting vested rights, nor any decision of this nor of any Circuit Court, which has condemned a law on that ground, provided its effect was not to impair the obligation of a contract."

The decision in Bailey vs. The Trustees, 11 Fla., was put upon the express ground that the act declared to be void violated the contract of the State.

The only laws which are unconstitutional because retrospective and retroactive, are *expost facto* laws, (which relate alone to crimes,) and laws impairing the validity of contracts.  1 Md. Chy.

The latter is a case in which it was held that a law which limited the defence in an action upon a usurious contract to the excessive interest was valid, although at the time the contract was made there was a law declaring such a contract absolutely void.

Having shown that the action of the convention is not impeachable for conflicting with the constitution of the United States, I come now to a brief inquiry as to the powers of that body generally.

" It may be affirmed that such a body is as almighty as the whole assembled people could be."   13 Law Reg., (N. S.,) 716.   " It must be conceded that the people, convened

and organized as a whole, and acting upon the fundamental principle that what the majority prescribe shall be law, could be under no restraint except that imposed by principles of natural justice." 32 Conn. ; 14 Law Reg.,

In the matter of Oliver Lee's Bank, 7 Smith, 12, a case involving the powers of constitutional convention held in New York, the court says, (by Judge Denio :) " The convention was not obliged, like legislative bodies, to look carefully to the preservation of vested rights. It was competent to deal, subject to the constitution of the Federal government, with all private and social rights, and with all the existing laws and institutions of the State." * * " When, therefore, we are seeking for the true construction of a constitutional provision, we are constantly to bear in mind that its authors were not executing a delegated authority, limited by constitutional restraints, but are to look upon them as the founders of a State, intent only upon establishing such principles as seemed best calculated to produce good government and promote the public happiness at the expense of any and all institutions that might stand in their way."

" The Legislatures of the respective States, except as restrained by the constitution of the United States and of their own States, have the same power as the Parliament of Great Britain." Redf. on Railways, 131 ; 1 Kent's Com., 448 ; 4 Wheat., 518.

What are the powers of the British Parliament, and what is meant when it is said in the books that a statute contrary to natural equity is void ? 1 Kent, 447.

" The principle in the English government is that the Parliament is omnipotent." And though, says Chancellor Kent, this principle does not prevail in America, (with reference to legislative bodies,) yet if there be no constitutional objection to a statute, it is with us as absolute and uncontrollable as laws flowing from the sovereign power under any other form of government. 1 Kent, 448.

An ordinance appended by a constitutional convention to

the constitution of the State is binding upon the executive, legislative and judicial departments of the government equally as if it had been incorporated into and formed a component part of the constitution. 15 Texas, 546.

Finally, the courts will not declare even a legislative enactment unconstitutional or void for light or trivial causes. This power, said Chief Justice Tighlman, (followed by the most illustrious jurists of America,) is a power of high responsibility, and not to be exercised but in cases free from doubt. (See Redfield on Railways, 548, n.) With even much more emphasis might the same thing be said where a court is called upon to pronounce unconstitutional and void an ordinance regularly passed by a sovereign convention of the people of the State.

*Papy & Peeler* for Appellee.

The question for the adjudication of the court arises upon the demurrer of the plaintiff to the plea of the statute of non-claim interposed by the defendant. It is maintained for the defendant that when the statute of non-claim has run a complete bar to the right of a creditor, and the rights of heirs and distributees have become vested under its operation, a subsequent repeal of the statute cannot revive the obligation which has thus become extinguished. Rights once vested cannot afterwards be divested by subsequent legislation, any more than property can be arbitrarily taken from one and given to another. The effect of the statute of non-claim is to bar the right and not to suspend the remedy; for, in the first case, no subsequent promise can revive the right of recovery, because the rights of the heirs have become vested in the property; whereas, in the latter case, when the remedy is only suspended, it may be revived by subsequent promise. The statute of non-claim, though in one sense a statute of limitations, is not what is commonly understood as a statute of limitations, which bars only the remedy. In the one case, the right is barred and rights be-

come vested in other parties, to-wit : the heirs ; whereas, in the other, the remedy is suspended, the obligation remaining in the party who by subsequent promise may revive the remedy, no other rights vested in other persons being thereby affected. When the statute of non-claim has run a complete bar, the heirs become entitled of right to the property, and the duty of the administrator is to deliver it to them, and no subsequent promise of his can deprive them of this right, much less can it be, that after he has distributed the estate, a subsequent repeal of the law can legally be permitted to divest them of that of which they had become completely vested. To allow this would upset all settlements that have been made under the provisions of existing laws.

Rights *once vested*, privileges once granted or sanctioned by the law of the State, if within constitutional limits, may be forfeited, but cannot be arbitrarily divested by future legislation. 3 Pike, (Ark.,) 302, 305.

It is repugnant to every principle of justice to take by law the property of one and give it to another by arbitrary rules. Blackstone treats it as a settled rule that all laws are to commence in future, and to operate prospectively ; and even in England, where the Parliament is almost omnipotent, Lord Coke says : " Their acts will be construed that no man who is innocent or free from wrong or injury shall by a literal interpretation be punished or *endangered*." The above doctrine is recognized in all English and American courts. 3 Pike, 305.

" If the Legislature can *increase* or in any way *change the responsibility* of a party, may they not with equal justice declare that certain property belongs not to one man, but to another ?" 3 Pike, 306.

A statute that divests *vested rights*, that violates contracts, or that assumes to control or exercise judicial powers, is unconstitutional and void. 11 Ohio, 609.

The Legislature has no power, as has been repeatedly held,

to interfere with vested rights.    To give property of A to B, is clearly beyond legislative authority.    6 Harris, (Penn.) 111.

Cooley on Constitutional Limitations, page 365, says: " When the period prescribed by statute has already run so as to extinguish a claim which one might have to property in the possession of another, the title to the property, irrespective of the original right, will be regarded as vested in the possessor, so as to entitle him to the same protection that the owner is entitled to in other cases.    *A subsequent repeal of the limitation law could not be given a retroactive effect so as to disturb this title.*"    The *right* being gone, the remedy fell with it, and as there could be no remedy without a corresponding right, it was useless for the Legislature to restore the former so long as it was prohibited by the constitution from interfering or meddling with the latter, that is, the *right*.    The right being gone, there could be no remedy.    Cooley cites a number of cases, viz:    5 Cranch, 358 ; 15 Wis., 532 ; 43 Penn., 512 ; 2 Black., 399 ; 3 Kan., 507.    So here the claim is extinguished by the statute's bar.    It is *gone*, and being gone, there could be no remedy.    The right of the heirs became *vested*, and hence the subsequent statute or ordinance could not rightfully divest him.    Sedgwick on Constitutional Law, page 410, is similar to the above.

The Legislature have the power to take away by statute what was given by statute, but not so as to disturb *rights already vested* under the former law.    6 Shep., 109.

The repeal of a statute cannot divest any right already vested under it.    2 Stewart, 160.

A claim against the estate of a deceased person once barred, is cut off entirely.    6 Foster, 497.

The ordinance of the convention of 1865 did not repeal the statute of non-claim.    It merely, in effect, suspended its operation with respect to claims against which the statute of non-claim had not run a complete bar.

WESTCOTT, J., having been of counsel in the case, did not sit.

RANDALL, C. J., delivered the opinion of the Court.

In June, 1866, Richard H. Bradford, appellant, commenced an action in the Circuit Court for Leon county against the respondent upon a promissory note, executed by Richard A. Shine, (since deceased,) dated December 28, 1861, at Tallahassee, in said county, payable one day after date to R. H. Bradford, or order, for seven hundred and twenty-eight dollars, with interest at eight per cent. per annum.

The defendant pleaded the general issue, and for further plea, says that according to the requirements of the statute in such case, he published a notice in a newspaper published in the county of Leon for the time required by law, notifying all persons having claims and demands against the estate of R. A. Shine, deceased, to present the same within two years from the date thereof, or the said notice would be pleaded in bar of their recovery, and that the plaintiff did not present his claim within two years from the publication of said notice, according to the requirement of the law and the notice aforesaid.

To this plea, on the 12th May, 1869, the plaintiff demurred on the ground that by an ordinance of the Constitutional Convention of the people of Florida, held on the 25th October, 1865, it was ordained as and for the fundamental law of this State, " that no law of this State providing that claims or demands against the estates of decedents shall be barred if not presented within two years, shall be considered as in force within this State between the 10th January, 1861, and the 25th October, 1865," and the plaintiff avers that the two years set forth in said defendant's plea as barring the plaintiff's claim, were a portion of the time between the said 10th day of January, 1861, and the 25th day of October, 1865. And afterwards, the plaintiff filed his further demurrer, showing " that the statute in said plea mentioned

is no longer of force and effect in this State, the same having been repealed by act of the Legislature of Florida, approved December 13, A. D. 1861, and not since that day enacted."

These causes of demurrer were overruled, and the plea held sufficient in law to bar the plaintiff's action against the defendant, whereupon judgment was rendered for the defendant, from which judgment the plaintiff appealed.

The appellant assigns for errors in the case the following:

1. The Circuit Court erred in overruling the plaintiff's demurrer to the defendant's plea.

2. The court erred in failing to sustain the plaintiff's demurrer to defendant's plea in this, that the court, in thus overruling and failing to sustain the demurrer, in effect decided against the validity of the seventh section of the schedule and ordinance of the constitution of 1865, retrospectively suspending the operation of the statute of non-claim, and said court, by its action, disregarded the statute of December 13, 1861, expressly suspending the statutes of limitations generally, both of which are distinctly assigned for error.

3. That the court erred in giving judgment for the defendant upon the pleadings.

4. That on the whole case, the law is with the appellants.

It was claimed in the argument, on the part of the appellant, " that it is difficult upon any general principles to limit the omnipotence of the sovereign legislative power by judicial interposition, except so far as the express words of a written constitution give that authority," and that " there is nothing in the constitution of the United States which forbids a State Legislature from exercising judicial functions, nor from divesting vested rights vested by law in an individual, provided its effect be not to impair the obligation of a contract ;" that " the aggregate community is sovereign, is the original source of authority and acknowledged depository of public power, ultimate and absolute ; that the con-

stitution of a State is the fiat of sovereignty, above judicial criticism, unless it conflicts with that of the United States, which it is the duty of the judiciary to determine," and that it was within the power of the Constitutional Convention of 1865 to have annulled perfect rights.

And it was also claimed that a statute of limitations, though it may at one time constitute a perfect right of defence against a civil action, may be abrogated or suspended so as to take away that right, there being no such thing as a vested right in a mere statutory defence against the payment of a debt.

Many authorities are referred to in which the courts of the United States have held that there is nothing in the constitution of the United States which prevents a State from passing a valid law to divest rights which have become vested by law, and it is not questioned that the courts of the United States very uniformly decline to adjudicate questions arising solely under the laws of the States where constructions have been given to them by the courts of the States— thus treating the interpretation as given by the State courts as rules of interpretation for the Federal courts, even though these courts, as an original proposition, might have adopted a different conclusion. The refusal, therefore, of the Federal courts to reverse the decisions and constructions of the State courts, is merely a refusal to intermeddle, which might introduce unnecessary confusion, and not a direct affirmance of the correctness of a rule or interpretation of a State law as made by the State tribunals.

It is said that the Supreme Court of the United States has held that a law of a State may be upheld, which may even set aside a decree of a State court and grant a new trial after the expiration of the time for taking an appeal has passed; and reference is made to the case of Calder and Wife vs. Bull, 3 Dallas, 386. The State Legislature of Connecticut, by law or resolution, set aside a decree of the Judge of Probate for Hartford, which decree disapproved

of a will, and granted a new hearing, which was had, and on appeal to the Supreme Court of Connecticut the judgment, upon the new hearing, was affirmed. The case was then taken to the Supreme Court of the United States, upon the ground that the act of the Legislature of Connecticut was an *ex post facto* law. By the existing law of that State, it was said a right to recover certain property had vested in Calder and Wife, the appellants, in consequence of a decision of a court of justice ; but in virtue of the subsequent resolution of the Legislature and the new hearing and decision, this right to recover was divested, and the right of property declared to be in Bull, the appellee. The Supreme Court defines the meaning of the phrase *ex post facto*, and say that in its origin and universal application, it refers to laws affecting penalties by making that act an offence which was not an offence when the act was committed, or which prescribes an aggravated punishment for a crime committed, &c., and the court says that this case is not within the inhibition of the constitution of the United States. Justice Chase, in his opinion, says : " Without giving an opinion at this time, whether this court has jurisdiction to decide that any law made by Congress, contrary to the constitution of the United States, is void, I am fully satisfied that *this court has no jurisdiction* to determine that any law of any State Legislature, contrary to the constitution of the State, is void. Further, if this court had such jurisdiction, yet it does not appear to me that the resolution or law in question is contrary to the charter of Connecticut or its constitution, which is said to be composed of its charter, acts of Assembly, and usages and customs. I should think that the courts of Connecticut are the proper tribunals to decide whether laws contrary to the constitution thereof are void." " Whether the Legislature of any of the States can revise and correct by law a decision of its courts of justice, although not prohibited by the constitution of the State, is a question of very great importance, and not necessary now

to be determined. I cannot subscribe to the omnipotence of a State Legislature, or that it is absolute and without control, although its authority should not be expressly restrained by the consitution or fundamental law of the State."

Paterson, Justice, and Iredell, Justice, in the same case show that "the constitution of Connecticut is made up of usages, and it appears that its Legislature have from the beginning exercised the power of granting new trials.    *    * They have acted in a double capacity, as a house of legislation, with undefined authority, and as a court of judicature in certain exigencies," and they have from time to time exercised all executive, legislative and judicial authority, and have distributed the two latter as they thought proper. "It may indeed appear strange to some of us, that in any form there should exist a power to grant, with respect to suits depending or adjudged, new rights of trial, new privileges of proceeding not previously recognized and regulated by positive institutions ; but such is the established usage of Connecticut, and it is obviously consistent with the general superintending authority of her Legislature." The Supreme Court of the United States, therefore, declined to interfere, because no question arose under the constitution of the United States, but the justices show fully that the Legislature of the State of Connecticut acted within its recognized judicial province in granting new trials and appeals, while they characterize such acts as " strange " in connection with the powers of a purely legislative body.

In the case of Warren vs. Sherman, 5 Texas, 441, the court says: " The clause in the constitution, if susceptible of a different interpretation, cannot be construed to divest or annul perfect rights which, by operations of and in conformity with the laws, had vested in the defendants ; to have annulled perfect rights was, beyond doubt, within the powers of the convention." That suit was brought by the appellant for the recovery of lands, the original certificate issued by the Board of Land Commissioners of San Augus-

Bradford vs. Shine—Opinion of Court.

tine county, and located and surveyed on the land in controversy, was not approved as a genuine claim against the government by the traveling Board of Commissioners, under the act to detect fraudulent certificates, &c.; nor was a suit instituted for its re-establishment previous to January 1, 1844, beyond which time an act of 1843 declared that suits for the establishment of certificates not so approved should not be commenced. The land was afterwards located and surveyed by virtue of the certificate, which is the foundation of the defendant's title, and a patent was issued on the 10th of February, 1846. The plaintiff afterwards, under the provisions of the constitution, opening courts for that purpose, sued for the re-establishment of his certificate, and obtained judgment therefor in 1847. The circuit court, upon these facts, charged the jury "that the plaintiff having failed to commence suit for the re-establishment of his certificate before the first of January, 1844, the land became vacant and subject to location; and the defendant's rights, under a patent issued subsequent to that period, and previous to the confirmation of the plaintiff's certificates, and the re-opening of the courts, *cannot be divested by such confirmation.*" And the Supreme Court in this case approved and affirmed the charge of the Judge, and the verdict and judgment in pursuance of it. And the suggestion of the court in the brief sentence quoted, that " to have annulled perfect rights was beyond doubt within the powers of the convention," had reference to the particular case in which two grants had emanated from the government; and it was inevitable that one or the other of them must prevail, and that the sovereign power might, by its fiat, divest one "perfect right" by recognizing another equally " perfect," the former having been subjected to forfeiture by the legislative act of limitation and the peculiar necessities of the case. " Nor is there any principle, or rule of law or equity, (says the same court), under which this confirmation could have

had retroactive operation so as to clothe the plaintiff with the superior equity to the land."

The principle, that a legislature or a convention may annul perfect rights, is well shown in the case of Cochran and Wife vs. Van Surlay, 20 Wendell, 365, in holding that " a *private act* of the legislature, authorizing the sale of the real estate of infants for their maintenance and education, is within the scope of the legitimate authority of the State Legislature." There can perhaps be no stronger illustration of the doctrine contended for. There was an absolute destruction of a vested title in lands under the authority of an act of the Legislature, passed with reference to the particular case. Nor can it be said, that in authorizing the divestiture of a title to land through the instrumentality of the courts, any one is " deprived of life, liberty or property without due process of law," that is, by mere arbitrary legislation. Upon examination of the case cited, in 15 Texas, Stewart et al. vs. Crosby, Commissioner, &c., we find the court merely say that they think it free from doubt that the ordinance appended to the constitution is a part of the fundamental law. Having been framed by the convention that framed the constitution, and adopted by the convention *and the people* along with the constitution, it is of equal authority and binding force upon the Legislative, Executive and Judicial Departments of the Government of the State as if it had been incorporated in the constitution, forming a component part of it. The suit was brought by the appellants as trustees of the Texas Emigration and Land Company to restrain the Commissioner from issuing patents to persons generally, who had made locations within the limits of the colony of said company, and particularly to certain persons named, and doubtless referred to, and determined the effect of the ordinance, (the provisions of which are not given in the report of the case,) upon the *inchoate* rights of persons who had contracted with the company for portions of the public lands of the State.

The case of Drehman vs. Stifel, 41 Missouri, 184, is cited as a strong case supporting the power of a convention to abrogate rights which have become fixed or vested. The plaintiff in the case owned a brewery near St. Louis, which was torn down by the defendant in 1861, under the orders of General Lyon, an officer of the United States in command of the department of Missouri, for the purpose of making a parade ground upon the premises, and for other military purposes, and afterwards the premises were occupied for those purposes. The plaintiff brought his suit to recover damages; the defendant pleaded an ordinance of the convention of 1865, incorporated in the constitution, which forbids the prosecution of all civil actions or criminal proceedings against any one for acts done after January 1, 1861, in pursuance of military authority, vested in him by the Government of the United States, or of that State, and providing, " that if any action or proceeding shall have hereafter been, or shall hereafter be instituted against any person for the doing of any such act, the defendant may plead this section in bar thereof."

The Court supported the plea on the grounds that the Constitution of the United States does not prohibit a State from enacting retrospective laws or ordinances of a civil nature which take away a right of action, or divest rights invested in an individual, if these laws do not impair the obligation of a contract nor divest *settled rights of property*, and that the constitutional ordinance is an act of indemnity and oblivion and pardon ; of indemnity so far as it affects civil actions, and oblivion as it affects criminal proceedings, and not inconsistent with the Bill of Rights ; and that the Government and not the officer was responsible for property taken for public use or destroyed by military authority. That it changes a rule of evidence, and makes that a justification and a defence which would not have been such before ; in other words, it extends to a party a right of defence at law,

27

which by all principles of equity and justice he ought to have, against the consequences of an act which he performs at the instance of the government, founded in a necessity of the government and into which the motives of the government alone and not the individual volition entered as the primary occasion and for the supposed public good. We cannot discover that in that case the constitutional ordinance is invested with any greater legal force or validity than would follow an enactment of the legislative branch of the government in like cases, except that as it is incorporated in the constitution, it has become more permanent as a law by being thus placed beyond the reach of the legislature to alter or repeal it according to the whim of any party which might afterwards be in temporary ascendancy in the State. While we admit that the Legislature by the repeal of a statute of limitations may take away the right to interpose the statute as a defence, we "cannot subscribe to the doctrine contended for that the legislative power is omnipotent for all purposes, even though it be not restrained by express constitutional limitation." This subject has been the theme of vast volumes of discussion, but the judicial opinion of this country has, since the independence of the American Colonies, been borne, by its natural tendencies co-operating with the political character of our institutions in the same direction, toward the conclusion that no government should possess the ultimate, irrefragible power to take away the vested rights of property, and by an arbitrary act of legislation to depose one from his estate lawfully acquired, and pass it to another, and this, whether this legislative act emanated from the legislation under an organized government, or from a popular Convention assembled for the purpose, expressing the wishes of the whole people in forming a constitution of government, either upon the ruins of a former one, or in creating one where none had before existed; and however the military power may have divested or created rights by the decrees of force, or into whatever confusion the affairs

Bradford vs. Shine—Opinion of Court.

of men may have been thrown by popular tumult, if there can be found a safe guide and a sure foundation upon which the sacred rights of individuals may rest secure, it is the duty and the high province of the judicial tribunals, so far as in them lies, to mete justice without violating these rights and in accordance with established principles of law and the common principles of justice.

It is true that the people in their sovereign capacity may establish rules of property, but they should not, so long as the safety and happiness of the whole may be preserved and secured without it, make any rule that may work injustice and wrong to the humblest or weakest; and when an enactment even in the fundamental law of the State has this inevitable tendency, it may be the duty of the judicial department, if possible, to declare such a law inoperative, as inconsistent with and contrary to the spirit and design of the whole structure.

With this premise, we will look at the origin of the constitution of 1865: A government of laws had existed for years in this State, under which property had been acquired, and certain rules had been established for its acquisition, and laws had been in force which protected men in their right of property, provided for the enforcement of contracts, and among others, established certain statutes of repose or limitation of time for enforcing certain rights. This government by means of certain political convulsions became ultimately disorganized in its political aspects, without, however, destroying the common rights and duties of the citizens, or the commercial relations of the people among themselves. Under a quasi military proclamation of the President of the United States, dated July 13, 1865, he appointed William Marvin as "Provisional Governor of this State, whose duty it shall be, at the earliest practicable period, to prescribe such rules and regulations as may be necessary and proper for convening a convention composed of delegates to be chosen by that portion of the people of said State who are loyal to the

United States and no others, for the purpose of altering or amending the constitution thereof, and with authority to exercise within the limits of said State all the powers necessary and proper to enable such loyal people of the State of Florida to restore said State to its constitutional relations to the Federal government, and to present such a republican form of State government as will entitle the State to the guarantee of the United States therefor, and its people to protection by the United States against invasion, insurrections and domestic violence."

Under this proclamation, Provisional Governor Marvin ordered an election to be held October 10th, for delegates to a convention. Whatever may have been the rightful authority or the legal force of this proceeding, it is certain that the authority and power of the convention so elected was limited to that delegated by the power which created and called it into being.

The election was held and the delegates elected assembled at the capital on the 25th October, 1865, for the purpose specified, which included the altering or amending of the former constitution of the State, conforming it to the exigencies of the times in their political aspects.

This convention was not called in pursuance of the constitution of 1838, commonly known as the St. Joseph's constitution; for that constitution provided that "no convention of the people shall be called, unless by the concurrence of two-thirds of each House of the General Assembly," and that constitution should not be altered except by bill, to be passed by two-thirds of each House of the General Assembly at two sessions of that body.

Whatever was the authority of the convention of 1865, it was limited, as before remarked, to the alteration of the former constitution in such manner only as to enable the State to be restored to its proper relations to the Union. Beyond this it had no power or agency, and beyond this, any action of the convention, unless subsequently ratified

by a vote of the people, was not binding upon the people. The functions of the convention were confined to the objects for which it was elected, the presentation of an amended constitution, having reference to the declaration of certain general principles and rules of government, and providing for the organization thereof by the election of the necessary officers, and among other things the organization of the legislative department, to whom the ordinary matters of legislation should be confided. It was not authorized to enter upon a general system of legislation, and its members when elected were not expected to annul general or special laws in existence which had been enacted in a regular and constitutional manner, and which were not repugnant to the general principles of Republican government.

In 1832, the legislature of South Carolina passed an act to provide for the call of a convention of the people of that State, "to take into consideration the several acts of Congress of the United States imposing duties on foreign imports, for the protection of domestic manufactures, and for other unauthorized objects," and "also other laws and acts of the government of the United States which shall be passed or done," &c.

A convention accordingly assembled and passed an ordinance to nullify certain acts of Congress. The Congress having afterwards modified the legislation refrrred to, the convention again assembled and repealed their former ordinance, but adopted another, declaring that the allegiance of the citizens of the State is due to the said State; and that obedience only, and not allegiance, is due by them to any other power or authority to whom a control over them has been or may be delegated by the State, and authorized the General Assembly of the State to prescribe oaths of office as should bind the officers of the State to the observance of such allegiance, and abjuring all other allegiance, The legislature subsequently passed an act prescribing an oath to be

taken by every militia officer, in accordance with the ordinance of the convention.

In two cases which afterwards arose involving the authority of the convention and the validity of this act of the legislature, the State vs. Hunt, and the State vs. McMeekin, 2 Hill, p. 222, O'Neall, J., says, " In one point of view, a convention may be illimitable. It is, however, then a revolutionary, and not a constitutional convention. It is one which assembles to resolve society into its elements, and to which the people necessarily give all power.   *   *   *   * A convention assembling under the constitution is only the people for the purposes for which it assembles, and if they exceed these purposes, their act is void, unless it is submitted to the people and affirmed by them. It is true the legislature cannot limit the convention, but if the people elect them for the purpose of doing a specific act or duty pointed out by the act of the legislature, the act would define their powers, for the people elect in reference to that and nothing else." " The people elected delegates in reference to this call ; it was not contemplated that they should do any act which was not necessary to give effect to the object and purpose of the people.   *   *   *   Here ended their power."

All the judges delivered opinions at great length, agreeing upon the general proposition that the power of the convention was limited to the matters submitted to them, and that beyond this no ordinance of the convention was of binding force until it should be ratified by the people.

The constitution of 1865 was not submitted to and ratified by the people, but, until the adoption of another constitution through the forms of law, it remained a general framework of " Provisional Government," having legal vitality only so far as was found necessary to restore civil order and enforce the laws already in existence, not incompatible with the purposes of its creation. We do not discover that the passage or the suspension of limitation laws, or that the ordinary functions of a legislative body were contemplated by

the authority which invited the people to meet in convention through their delegates, or that in the election of delegates they had any such object in view. And we think the remarks of the South Carolina judges in the cases alluded to, upon the subject of the effect of an ordinance of this character, are based upon the solid foundations and correct theory of republican government. Our conclusion, therefore, is that section 7 of Article XVI, "Schedule and Ordinance," of the constitution of 1865, is not operative to suspend or repeal the laws of this State, which barred claims or demands against the estates of decedents if not presented within two years as provided by statute.

Without, therefore, determining the interesting questions which were so ably and forcibly presented by the respective counsel for the appellant, as to the omnipotence of the legislature in reference to the question presented, we will briefly consider by way of illustration what may have been the effect of the enforcement of the ordinance.

The facts as presented by the pleadings are, that the maker of the note died, and his administrator proceeded to administer and published the notice to creditors, and that two years elapsed, whereby in the language of the statute, the *claim was barred.*

The presumption is, though it is immaterial as affecting the principle, that at the expiration of that time the estate was distributed, if any remained after paying debts, and it may be that the estate was all absorbed in liquidating the claims of creditors of the deceased. What then would be the effect of the retroactive suspension of the statute of non-claim? The plaintiff would have judgment against the administrator and would be entitled to a *pro rata* amount upon his judgment equal to that apportioned to other creditors. Those creditors could not be required to refund from time to time as claims might be presented like that here sued for, and the administrator could not avoid the *pro rata* payment upon the judgments so recovered, because this ordinance be-

ing enforced, the statute would afford him or his sureties no defence. But it may be answered, the administrator and his sureties might have their relief in the court of chancery against this gross injustice. To which it may be replied, the court of chancery could not afford the supposed relief, because that court is bound by the laws of the State equally with the courts of law, and neither can disregard a positive statute. The court of chancery could not, then, without disregarding the ordinance, afford the proposed relief, and must consider that the statute of non-claim was not in force, and that the administrator had distributed the estate without authority of law, thereby creating a liability against him and his sureties which did not before exist.

And further, in relation to the character of the statute of non-claim. It is a statute of limitation, but unlike the ordinary statutes limiting the time of commencing civil actions, its language is, that at the expiration of the time limited the claim is "barred." "A claim against the estate of a deceased person once barred is cut off entirely, since no person has either power or right to revive it by a new promise or in any other mode." Brown vs. Leavitt, 6 Foster, N. H., p. 497. We think this view of the Supreme Court of New Hampshire is a correct one, but without further consideration, we will not say that it is a final conclusion as against any proper action of the sovereign power.

It was urged that the provisions of section 3 of the act of Dec. 13, 1861, entitled an act providing for the stay of executions in this State, suspending the statute of limitations then in force "in relation to civil actions," in effect suspended the statute of non-claim. We cannot agree to this, because the statute of 1861 refers only to the law limiting the time for commencing *civil actions*, and must be construed with reference to the commencement of ordinary civil actions, according to the legal and popular understanding of the terms used. The convention of 1865 evidently took the same view of it, otherwise they doubtless would not have

attempted to declare the statute of non-claim suspended. Had they considered that the act of 1861 affected the presentation of claims to an administrator, they would at most have given that interpretation to the act of 1861.

We are therefore constrained to hold that the defendant's plea set out a valid defence to the action, and that the judgment of the Circuit Court must be affirmed.