THE PEOPLE, *ex rel.* Henry A. Furman, and Henry A. Furman, *vs.* HARRISON CLUTE.

Where an elector votes for an ineligible candidate, with knowledge of his ineligibility, his vote is void. And it makes no difference that all the electors did not have knowledge.

Under such circumstances, the eligible candidate having the greatest number of votes is elected; provided that number is greater than the number of votes cast for the ineligible candidate by electors who did not possess such knowledge.

Such knowledge may be presumed. And where the ineligibility of the candidate arises from his holding a public office, the electors within the territorial limits of such office will be charged with knowledge of such ineligibility.

A supervisor of a town is ineligible to the office of superintendent of the poor.

Where a city charter declares the supervisors of the wards of the city shall be " subject to all the provisions of law now applicable to those officers respectively, in the several towns of the State," the supervisors of such wards are ineligible to the office of superintendent of the poor.

The legislature has power to prescribe qualifications for the office of superintendent of the poor.

Chapter 352 of the laws of 1829, and chapter 80 of the laws of 1853, are constitutional and valid.

Where a statute has been incorporated in the text of the Revised Statutes without legislative authority, a subsequent statute, purporting to amend it, is effectual for that purpose, though it refer to the former act only by its unauthorized numbering as a section of the Revised Statutes.

Chapter 80 of the laws of 1853 was operative as an amendment of chapter 352 of the laws of 1829.

In an action to which the people are a party, costs are not in the discretion of the court.

APPEAL from a judgment entered upon the decison of the court at special term, (*reported* 12 *Abb.* 399, *N. S.,*) the case being thus :

The action was brought to oust the defendant from the office of superintendent of the poor of the county of Schenectady, and to put the relator in his place. The relator and defendant were opposing candidates for that office, at the general election held in November, 1871. The defendant received the greater number of votes ; the totals being as follows:

| | |
|---|---|
| For Clute, | 2448 |
| " Furman, | 2228 |
| Total, | 4676 |

At that election, the fifth ward of the city of Schenectady constituted one election district, and the vote therein was as follows:

| | |
|---|---|
| For Clute, | 296 |
| " Furman, | 275 |
| Total, | 571 |

At the charter election of the city of Schenectady held in April, 1871, Clute had been elected supervisor for the fifth ward, and by the electors of that ward. He accepted the office and discharged its duties until December 14, 1871, when he resigned. Clute received the certificete, filed his bond, took the oath, and January 1, 1872, entered into the office. Furman also filed his bond, took the oath and claimed the office.

Upon these facts the court, at special term, decided that neither party was elected; and ordered judgment of ouster against Clute, but refused to give Furman the office, or to give costs to either party.

Judgment having been entered accordingly, both parties appealed.

*Alex. J. Thompson* and *E. W. Paige*, for the plaintiffs.

I. Furman was legally elected superintendent of the poor, and is entitled to the office. 1. Where electors vote for an ineligible candidate, with knowledge of his ineligibility, their votes are void, just as if they had voted blanks, or had not voted at all; and, as a necessary consequence, the candidate having the next highest number of votes is elected. The fact of ineligibility alone is not sufficient; none of the cases hold that; but the gist of the rule is the *scienter.* And the knowledge may be presumed; in fact the rule is oftener applied upon constructive notice than actual notice, just as in cases relating to real estate. (*a.*) This has been undisputed law in England for 300 years, and is therefore the law of this State. (*Const. art.* 1, § 17.) We cite but one case. (*Gosling* v. *Veley,* 7 *Q. B.,* 53 *Eng. Com. Law,* 437.) See the judgment of Lord Denham, (pp. 437–440,) because the rule is admirably stated there, and because the other authorities are referred to, either in that case or in those to be cited presently. (*b.*) The American authorities are as follows: *Cushing's Lex Parliamentaria,* §§ 175 *to* 180. To the same effect, see *Wilson's Dig. of Parl. Law, pp.* 107 *to* 114. *Angell & Ames on Corp.* (*p.* 98, *n.* 3,) say: "If the Assembly be duly convened, and the majority vote for an unqualified person, after notice that he is not qualified, their votes are thrown away, and the person having the next majority, and not appearing to be disqualified, is duly elected." (*Gulick* v. *New,* 14 *Ind.* 97.) By article 16, section 7, of the constitution of Indiana, it was provided that "no person elected

The People *v.* Clute.

to any judicial office shall, during the term for which he shall have been elected, be eligible to any office of trust or profit under the State, other than a judicial office" Wallace was mayor of Indianapolis, elected thereto by the electors of the city. As such he was a judge of the mayor's court, the jurisdiction of which extended over the county. He ran for sheriff of the county, and received the greatest number of votes. This action was brought by his opponent to obtain the office. It was held by the whole court, that the votes cast for Wallace were void— blanks—because all the electors of the county had notice of his ineligibility, since they were within the territorial limits of his office, and that Gulick was elected. In *Carson* v. *McPhetridge* (15 *Ind.* 331) the same points were ruled, upon an election for county clerk. (*Hatcheson* v. *Tilden*, 4 *Har. & McHenry*, 279.) By the first constitution of Maryland it was provided that there should be two sheriffs to each county, and by section 42, " no person" was " to be eligible to the office of sheriff" unless he possessed a certain amount of property. The plaintiff, at an election which lasted three days, received the greatest number of votes for the office of sheriff. At the beginning of the election he did not possess the requisite amount of property, but he received it at noon of the third day. The election judges gave the certificates to the two candidates who received the next highest number of votes. Held, by the general court, that they were right, since the number of votes cast for the plaintiff after noon of the third day were not sufficient to elect him. (*Commonwealth* v. *Read*, 2 *Ash.* 261.) The county treasurer was, by law, required to be elected by the county board, by ballot, when a quorum was present. The county board of Philadelphia county, a quorum being present, proceeded to elect a treasurer. Nine members voted *viva voce* for Thompson, and one member by ballot for Read. It was held by the common pleas that Read was elected by the

one vote, because the others were nullities. (*See the remarks on p.* 273. *See also Commonwealth* v. *Green,* 4 *Wharton,* 521, *the remarks of the court at pp.* 580, 581.) *Commonwealth* v. *Cluley,* (56 *Penn.* 270,) was a rule on the relation of McLaughlin, against Cluley, to show cause why a *quo warranto* should not issue against Cluley to test his right to the office of sheriff. At the election Cluley had received 19,915 votes and McLaughlin 12,925 votes. The suggestion rested upon the allegation that Cluley was ineligible at the time of the election, but it did not appear that the electors had notice of the disqualification; nor did it appear that if the votes for Cluley were thrown out, McLaughlin was elected. The case turned upon the precise point that inasmuch as it was not alleged that, throwing out Cluley's votes, McLaughlin had a majority, therefore it did not appear that McLaughlin had such an interest in the question as would enable him to contest the election. It is true that Mr. Justice Strong, speaking *obiter,* said that McLaughlin was not elected; but that was correct, for both of the reasons above given, and he then proceeded to say, page 274: "There is more reason for this in England, where the vote is *viva voce,* and the elective franchise belongs to but few, than here, where the vote is by ballot, and the franchise well nigh universal. In those cases the notice was brought home to almost every voter, and the number of electors was never greater than three hundred, and generally not more than two dozen. Besides, a man who votes for a person with knowledge that the person is incompetent to hold the office, and that his vote cannot therefore be effective, that it will be thrown away, may very properly be considered as intending to vote a blank, or throw away his vote."

Without considering or quoting from the very able dissenting opinion of Chief Justice Thompson in that case, we submit that the majority of the court have laid down principles upon which Furman is entitled to the office.

The People *v.* Clute.

This question has been discussed at different times in the legislature of Massachusetts, and it has been uniformly decided that votes given for ineligible candidates, where the electors had notice, should be regarded the same as blank votes. In 1843 an effort was made to change this parliamentary rule, and a majority of the committee submitted a report, accompanied by a resolution, to the effect that it was "not in accordance with the constitution and laws for the two branches of the legislature to reject, in making up the count, the ballots cast for ineligible candidates." A minority of the committee submitted an adverse report, saying: "The fact that the votes given for ineligible candidates, when the two houses have met in convention for the purpose of filling vacancies in certain offices, have been rejected from the count, is of long standing; and that no evil has resulted from such practice is, of itself, a sufficient reason why a different rule should not be established. It is time enough to provide a remedy when an evil is found to exist, and not in anticipation of an evil. This, it is believed, is a safe course in all cases. * * * The practice of rejecting blank pieces of paper, although they may have the form and shape of the actual votes which are cast, is believed to be uniform everywhere. The reason for the rejection of such paper is that it is not a vote given and numbered; that no one is designated who can be elected. It is, however, no less an expression of dissatisfaction to the candidate voted for by other persons, on one side or the other, than it would be if it bore the name of an imaginary being, or a person ineligible. In both cases it is not a vote, and should not so be treated. So far as precedents can be found, the practice of rejecting from the count votes cast for an ineligible candidate is not peculiar to the convention of the two houses in the Massachusetts legislature. It has obtained more or less in the house of representatives of the United States, and the house of commons in Great

Britain.  *  *  *  Inasmuch as the custom has obtained, for aught that appears, from time immemorial, to reject such votes, the undersigned take leave to submit that the proposed resolution of the majority of the committee is uncalled for, and that no further action be had on such order." The house laid the resolution of the majority on the table, thus in effect adopting the report of the minority. (*Cushing's Reports of Contested Elections in Massachusetts, p.* 499.) The subject was again discussed, and the decision reaffirmed, that votes cast for ineligible candidates should be thrown away. In 1849 Mr. Slade was returned as the duly elected representative of the town of Somerset, and his seat was contested, for the reason, among others, that a ballot for Nathaniel Morton, of Taunton, for member of congress, was thrown out by the judges of election. The committee, in their report, declaring Mr. Slade lawfully entitled, discussed this question as follows: "The policy of the law requires that such a construction should be put upon all proceedings at elections as to make such proceedings valid, rather than nugatory. An election is always attended with trouble, inconvenience and expense, and should not be set aside for light or frivolous causes. If votes cast by mistake for persons not eligible are to be counted, then the intention and will of the voter is defeated; if, on the other hand, such votes are wilfully put into the ballot box, the person who thus indicates so clearly his disregard of the value of the elective franchise, that it is only a deserved punishment for his delinquency to deprive his vote of all weight and influence at such election. By so doing a voter is not deprived of any legitimate exercise of his right, because he can always manifest his opposition to any one candidate by voting for some other. In *Rex* v. *Monday*, (*Cowp.* 530,) Lord Mansfield said, the only way of voting against one was to vote for another. Finally, it seems to the committee that there is no reason why a person who votes

for an ineligible candidate should not be put upon the same footing with one who does not vote at all, as in both cases. the parties show a disposition to prevent an election, and both of them show an unwillingness to perform their duty, by aiding to promote those elections which are absolutely essential to the existence of the government. For if every voter refrained wholly from voting, or voted for an ineligible candidate, the result would be the same, no choice; and although it is true that no penalty is attached by law to a neglect of this obligation of voting, yet the obligation is not the less plain for that; and the committee believe it to be a duty too important to be neglected, and too sacred to be trifled with, by voting for fictitious persons or ineligible candidates.  *  *  *  The voter who puts into the ballot box a blank piece of paper, as clearly indicates his opposition to all the candidates as he who puts in a vote for an ineligible candidate ; and there seems to be no reason why the opinion of the one should not be entitled to consideration as well as that of the other." Report agreed to April 10, 1849.  (*See Cushing's Contest. Elec. Cases, Mass. p.* 576.)   2. The electors of the fifth ward knew that Clute was disqualified. (*a.*) From the evident notoriety of the fact.   The result of the English cases is thus stated in *Grant on Corp.* 208 : " A disqualification, patent or notorious, at once causes the votes given for the candidate laboring under it to be thrown away." (*See also Male on Elections,* 111 ; *Heywood on County Elections,* 535 ; *Roe on Elections,* 278, *ed.* 1818 ; *Clerk on Elec.* 173, 4.) And in America, see *Cushing's Lex Parliamentaria, Wilson's Dig. of Parliamentary Laws,* and *Hatcheson* v. *Tilden,* and the two Indiana cases above cited.   No disqualification could be more patent or notorious than this.   Clute was representing the ward in the board of supervisors at the time.   Every resident or elector who had dealings with that board must go to him.   As a ward officer he had certain administrative functions, and

it was but six months since every elector in the ward had voted either for or against him for the office of supervisor. No one can doubt for a moment but what every elector in the ward knew that he was their supervisor. It is impossible to conceive a stronger instance. (*b.*) Every constituent, and every one within the jurisdiction of a public office, is bound to know who is the incumbent of that office for the time being. The English rule is given in *Grant on Corp. p.* 109 : "When the ineligibility of a candidate arises from his holding or having held a public office, the people within the jurisdiction of that office are held in law to know, and are chargeable with notice of such ineligibility." And on page 206 he says, in enumerating instances sufficiently patent to amount to actual notice, "Or where a candidate already held a corporate office considered in law incompatible with the office sought." (See also *Heywood on County Elec. p.* 533 ; and 1 *Roe on Elec. p.* 279, citing *King* v. *Blissel*, where Lord Mansfield held the fact of one holding the office of city chamberlain sufficient notice.) (*See Wilson's Dig. of Parliamentary Law, p.* 111.) In *Gulick* v. *New*, (14 *Indiana*, 100,) Wallace was mayor of Indianapolis, and as judge of the mayor's court an officer of the county; like our justice of the peace, who is elected by a town, but is yet a county officer. It was held by the whole court, that *all* the electors of the county were chargeable with notice of the fact of his being mayor; that their votes for him were thrown away, and that Gulick was elected. Chief Justice Perkins, in delivering his opinion, page 104, says : "As mayor, he was simply a corporation officer, and, perhaps, necessarily known as such only within the city limits. But he was more than a city officer. He was a judicial officer, a judge of a court, with jurisdiction coextensive with the county limits, created to administer the general laws of the State to the extent of his jurisdiction. In this capacity of judge the people of the county

The People *v.* Clute.

were bound to know the disability, as to the right to hold other offices, which his character as judge brought upon him by the constitution and laws of the State." This decision, it will be observed, goes much further than we claim in this case. It is as if we were to argue, that because the authority of the board of supervisors is co-extensive with the county, therefore every elector in the county was bound to know that Clute was a supervisor. The case of *Carson* v. *McPheteridge* (15 *Indiana*, 331) is on all fours with this. There was a law that one person should not be county clerk more than eight years. During his eighth year, and while holding the office, McPheteridge was a candidate for re-election, and received the greatest number of votes. It was held by the whole court, that, by reason of his holding the office, every elector in the county knew of McPheteridge's ineligibility; that their votes for him were consequently thrown away, and his opponent elected. The rule that persons within the territorial limits of a public office are bound to know who is the incumbent of that office, is universal. The most numerous applications of it are where questions arise of resisting or refusing to assist a public officer. Even courts within the district are bound to take judicial notice of such incumbent, and that of just such an office as this. (*Holman* v. *Burrow*, 2 *Ld. Raym.* 794. 1 *Greenl. on Ev.* § 6.) (*c.*) Electors will be presumed to know every fact in regard to a candidate's qualification, of which they had the means of knowledge, and which they might have ascertained had they pleased, under the rule of 2 *Show.* 300; 1 *Mod.* 87, 300, that "wheresoever no man is bound to give notice, every man is bound to take notice. (*Grant on Corp. p.* 208.) This rule does not proceed upon the belief that an elector does in reality know such facts, but because it is his duty to find them out. The law requires the consummation of an election upon the day fixed, and the public convenience cannot wait upon an elector's mis-

takes. Every presumption is in favor of a choice. See the quotations from *Cushing's Lex Parliamentaria*, and the Massachusetts cases, above; also all the text books, and the two Indiana cases cited. Opposed to all this mass of authority there is absolutely nothing; not a single adjudged case; not even an *obiter* expression of opinion by a judge. 3. The rules of the common law above stated were adopted and enforced in the colony of New York; the English cases are therefore controlling authorities under article 1, section 17, of the constitution. When Lieut. Governor Leisler was attainted of high treason and executed, in 1689, several of his adherents were attainted at the same time, and kept in prison until released by order of the king in council, with the restriction that they should not leave the colony; among them was one Gerardus Beeckman. In 1694, shortly after his release, he stood for representative for Kings against one Henry Filkin, and received the greater number of votes, (*Doc. relating to Col. Hist. of N. Y.*, vol. 4, *p.* 83;) but Filkin was returned by the sheriff. (*Jour. Leg. Coun. p.* 49.) Beeckman petitioned, and his petition was referred to the attorney-general, because he was disqualified by his attainder. (*Idem.*) The opinion of the attorney-general has not been preserved, but it appears from the extracts from Governor Fletcher's letters contained in an order of the king in council, (*Doc. relating to Col. Hist. of N. Y.*, vol. 4, *p.* 83,) that the petitition was rejected, and Filkin sat through that entire assembly. (*Votes and Pro. Gen. Assembly, Col. N. Y.*, vol. 1, *pp.* 35, 47, 52.)

In 1701 the following case occurred, which is thus reported in *Votes and Pro. of Gen. Assembly, Col. N. Y.*, vol. 1, *p.* 116. August 20, 1701. " Ordered, that this house do forthwith take into consideration whether Major Wessels, returned one of the representatives for the city and county of Albany, be qualified according to an act of assembly of this province, entitled, ' An act for regulating elections

The People *v*. Clute.

for representatives in general assembly,' &c., and that the same be done in the house.   Then the house proceeded to inquire whether the said Major Wessels was qualified to sit as a member of this house; whereupon some persons were called up who informed the house that Major Wessels was an inhabitant in Dutchess county, and this they were ready to depose when called thereto; and then a bond was produced to this house, under the hand and seal of the said Major Wessels, to the high sheriff of the city and county of Albany, which follows in these words."

This was a bond to indemnify the sheriff for fines and penalties which he might be subjected to for returning Major Wessels, if elected, on account of his non-residency.

"Upon the consideration whereof the house was of opinion that Major Wessels was not qualified to be a member of this house according to the aforementioned act.

Thereupon ordered, that the said Major Dirck Wessels be no longer deemed or esteemed a member of the house, but that he be and is dismissed from any further attendance as a member of the house.

Ordered, that the high sheriff of the city and county of Albany be called before this house, he being in town, to produce the poll of his election, that the house may see which of the candidates is the next person that has the majority of voices, for that city and county, for a member of this house, in the room of Major Wessels, who is dismissed this house.

The high sheriff of the city and county of Albany appeared according to order, and delivered to this house 14 papers, containing the poll of his election, and the house proceeded immediately to inspect the same accordingly.

Ordered, that Mr. Morgan, Cornelius Sebring and Mr. Hering be a committee to examine the said poll, and make their report to this house.

The said committee brought in their report as follows: The committee appointed to examine the high sheriff,

for the city and county of Albany, his poll for electing representatives to serve in general assembly of the province of New York,

Report, that they have examined the same, and do find that Mr. Ryer Schermerhorn is the candidate that has the next majority of voices in the said poll, and therefore are humbly of opinion that Ryer Schermerhorn ought, according to the usage and custom of this house, to sit in this general assembly in the room of Major Dirck Wessels, dismissed this house, and that he take his place accordingly.

By order of the committee,

CORNELIUS SEBRING, Chairman.

Which was read and approved of.

Ordered, that Mr. Ryer Schermerhorn do forthwith attend this house, and be received as a member of this house, for the city and county of Albany, in the room of Major Dirck Wessels, dismissed this house."

Mr. Schermerhorn thereupon took the oath of office, and was ordered to take his place in the house, as a member; which he did.

In 1745 there was another case. Captain Bradt and Edward Holland were opposing candidates for representative of the township of Schenectady. The sheriff returned Captain Bradt, and Holland petitioned, claiming that he had a majority. That fact, however, depended upon certain questions of fact in regard to the qualifications of voters, June 22, 1745. Holland's petition was referred to a commitee. (*Votes and Proceedings of the Gen. Assembly, Col. of N. Y., vol.* 2, *p.* 65.) July 6, the committee reported that " many matters of fact being alleged, there be a scrutiny before this house," and that testimony be taken before Cornelius Cuyler, Esq., mayor of Albany, and Philip Livingston, Esq., a justice of the peace, " at the house of Anne Beek, in the township of Schenectady," and that the depositions be transmitted to the house. (*Id. p.* 70.) October 29. The depositions having been

The People *v.* Clute.

transmitted, the matter was taken up, and the petition of the sitting member heard by counsel, and Col. Morris made a motion that the "controverted qualifications of the electors be first considered;" which was negatived. (*Id. p.* 78.) November 1st. The matter again being taken up, Mr. Lecount offered the following:

"The council for the sitting member having alleged that Mr. Edward Holland, the petitioner, not being an inhabitant of the township of Schenectady, was not qualified, according to the charter of the township of Schenectady and the laws of this colony, to represent the said township in the general assembly. I move that the house may now proceed to the examination of that allegation;" which was carried in the affirmative. And the following was then passed: "Resolved, that Mr. Edward Holland is not qualified, according to the charter of the town of Schenectady and the laws of this colony, to represent the said township in the general assembly." (*Id.* 78.) And the petition was dismissed. It appeared without question that Mr. Holland was a resident of the city of New York. (*Id.* 65.) 4. The judge at special term recognized the weight of these authorities, and acknowledged the law to be as above insisted upon. But he held that there must be notice to all the electors; that notice to a part of them would not operate to throw out their votes unless all the electors had notice, because you cannot separate a part from the whole; that therefore notice to the electors of the fifth ward alone would not operate to throw out their votes, but that we must show notice to the whole county, and as we had not done that, Furman was not elected. We submit that this is erroneous. (*a.*) In the first place it has been expressly decided to the contrary. In *Rex* v. *Hawkins*, (10 *East*, 211; *affirmed in the House of Lords*, 2 *Dow*, 124,) only four fifths of the electors who voted for the disqualified candidate had notice, and it was expressly held that unless the number of those who had voted ignorantly was equal to or greater

VOL. LXIII.                24

than the number who voted for the qualified candidate, he
was elected. In the Maryland case, (*Hatcheson* v. *Tilder*,
4 *Har. & McH*. 279,) above cited, where the candidate re-
ceived the necessary amount of property on the third day
of the election, it was held that the votes given after he re-
ceived it were valid, those given for him before, thrown
away, and since the votes given after that period were not
enough to elect him, his opponents were elected. Chief
Justice Chase said, (*p.* 280:) " The plaintiff can only be
entitled to such votes as were given after he received the
necessary qualifications, all votes in his favor previous be-
ing illegal and void." In the *Cork County case* (*Knapp &
Ombler*, 391) the sitting member of parliament was dis-
qualified, and the committee " being satisfied that notice
had been given to a sufficient number of the voters to re-
duce the poll of the sitting member below that of the peti-
tioner," they seated the petitioner. See also cases to the
same effect cited in *Corbet & Daniel's Election Cases*, (*p.* 8,
*note.*) *Arnold on Corporations*, (*p.* 142,) says : " If the in-
capacity of the candidate is not announced till after the
proceedings at the election have commenced and votes
have been taken, the votes given for the unqualified can-
didate before such announcement, are not thrown away;
another candidate, therefore, whose votes upon the whole
poll do not exceed in number those votes which were given
for the unqualified candidate before notice of his incapacity,
will not be considered as duly elected." To the same
effect see *Rogers on Elections*, 227, and *Grant on Corpora-
tions*, 208, *note n ;* and the language of the cases and text
books, generally, is that votes received after notice, are
thrown away. (*b.*) The reason of the rule shows it. It is
this : one who votes a blank, or who does not vote at all,
must be held to acquiesce in the choice of those who vote
for some qualified candidate, because he cannot be allowed
to defeat the election ; and one who votes for an ineligible
candidate, knowingly, or when he ought to have known it,

does just the same thing as if he had voted a blank.   He cannot be allowed to defeat the election in this way any more than in the other.   The only way of voting against one, is to vote for another who is eligible.   (*Rex* v. *Fox-croft*, 2 *Burr*. 1021.   *King.* v. *Monday*, *Cowp*. 537, *per Lord Mansfield*.   *Gosling* v. *Veley*, 7 *Q. B*. [53 *Eng. Com. L.*] 437, *per Lord Denham; and the cases and text books previously cited.*)   It is a matter which is personal with each voter; and it makes no difference, as far as he is concerned, whether the rest of the electors have notice or not; nor in what way, nor for whom they cast their votes.   All the authorities speak of votes given after notice as thrown away, or as blanks; as if one gave his vote "for the man in the moon," said Lord Campbell in *Queen* v. *Coaks*, (28 *Eng. L. and Eq.* 307.)

II. The court at special term erred in not giving costs to the plaintiffs, upon their recovery.   Before the amendment of 1862, subdivision 3 of section 304 of the Code read, "In actions of which, according to section 54, a court of a justice of the peace has no jurisdiction."   Section 54 provided that no justice shall have cognizance of a civil action in which the people of the State are a party. In 1862, section 304 was amended by omitting the words, "according to section 54."   So that, if the rule was changed at all by the amendment, it is the stronger for our argument.   But that amendment had no practical effect. (*Staiger* v. *Schultz*, 3 *Keyes*, 614.)   The "other actions" mentioned in section 306 are simply equity actions.   (*Hinds* v. *Myers*, 4 *How*. 356.)   And this is an action in which costs were always a matter of right, upon recovery. (2 *R. S.* 613, § 3; 1 *R. L.* 343, § 4.)

III. Chapter 80 of the laws of 1853 operated as an amendment of chapter 352 of the laws of 1829, and is a valid enactment.   1. The first rule of statutory interpretation is to ascertain the intention of the legislature.   *Quod verba intentioni inservire debent.*   (*Potter's Dwarris, pp.*175

*to* 180.) In the fourth edition of the Revised Statutes, chapter 352 of the laws of 1829, is inserted as section 22, of chapter 20, title 1, part 1, and is the same section referred to in chapter 80 of the laws of 1853. The original section 22 of that title of the Revised Statutes, related to matters of excise money and penalties. The intention of the legislature is therefore too plain to be mistaken. 2. Admitting that the fourth edition of the Revised Statutes was an unauthorized compilation, it was composed of nothing but laws in force. An amendment of it was therefore really an amendment of a law. 3. Although the fourth edition was originally, an unauthorized compilation, it has been so constantly treated by the legislature as a valid compilation of the laws, that it must be deemed to have been adopted and ratified. See an account of this matter in the introduction to Edmonds' Statutes, page 7. Judge Edmonds there puts a question, whether the repeal of an independent enactment, thus incorporated into the text of these editions, would operate as a repeal of the original law; but he does not question the validity of an affirmative enactment. 4. Chapter 80 of the laws of 1853 is a law enacted by the constitutional authorities, which expressly provides that no supervisor shall be elected superintendent of the poor. And it makes no difference in what way the enactment has been made, so long as there is no doubt about it. 5. The act amends the Revised Statutes. This being so, it is immaterial which edition is amended, so long as that edition does in fact contain the Revised Statutes. It is also entirely immaterial what the amended section previously contained; or what was its origin; or indeed, whether there was ever any such section before, so long as the amending act states clearly how it shall read in the future. Suppose there had been no section 22, will it be doubted but what chapter 80 of the laws of 1853 has created one?

IV. Admitting that chapter 80 of the laws of 1853 is

invalid, chapter 352 of the laws of 1829 is effective to disqualify a supervisor from being elected superintendent of the poor. The word "appoint" is broad enough in its meaning to include an election.

V. Chapter 80 of the laws of 1853 is constitutional and valid. 1. The statute book of every State in the Union, except Connecticut, contains a law imposing a qualification for an elective office. [Referring to the statutes of the several States.] 2. It is not repugnant to article 1, section 1, of the constitution. (*a.*) The words " law of the land" mean a pre-existing law. (*Wynehamer* v. *The People*, 3 *Kern.* 392–395. *The People* v. *Quant*, 2 *Park. Cr. Rep.* 414, *and note, p.* 687.) (*b.*) In this action Clute is obtaining " the judgment of his peers." 3. It is not repugnant to article 11, section 1, as restricting an elector's right to vote. (*a.*) A statute is not unconstitutional unless so repugnant to constitutional provisions that the statute and the constitution cannot stand together. 1. The legislature possesses all the powers of the British parliament, except as restricted by the constitution, either by express provision or " necessary implication." (*Wynehamer* v. *The People*, 3 *Kern.* 378, 410, 411, 428–430, 452, 453, 477. *The People* v. *Draper*, 15 *N. Y.* 543. *Leggett* v. *Hunter*, 19 *id.* 445. *The People* v. *Morrell*, 21 *Wend.* 563. *Butler* v. *Palmer*, 1 *Hill*, 324. *Bloodgood* v. *M. and H. R. R.*, 18 *Wend.* 9. 34 *Barb.* 137, 138. *The People* v. *Quant*, 2 *Park. Cr. Rep.* 412–414.) 2. To nullify a law by " necessary implication," it must be so repugnant to a provision of the constitution that both cannot stand together, or be consistently reconciled. It must frustrate the constitution. (*The People* v. *Draper*, 15 *N. Y.* 544, *per Denio, J. Newell* v. *The People*, 3 *Seld.* 109. *Fletcher* v. *Peck*, 6 *Cranch*, 128. *Ex parte McCollum*, 1 *Cowen*, 450. *Clarke* v. *Rochester*, 5 *Abb. Pr.* 107. 24 *Barb.* 446.) This is the rule in regard to the repeal of one statute by another by " necessary implication." (*McCool* v. *Smith*, 1 *Black*, 459. *Wood* v. *U. S.*,

16 *Pet.* 342. 10 *Barr*, 448. *Hartford* v. *U. S.*, 8 *Cranch,* 109. *Brown* v. *County Com.*, 21 *Penn.* 37. *Street* v. *Commonwealth,* 6 *Watts & Serg.* 209. *Bowen* v. *Lease,* 5 *Hill,* 221. *Williams* v. *Potter,* 2 *Barb.* 316. *The People* v. *Demning,* 1 *Hilt.* 271.) And the rule is the same in constitutional as in statutory construction. (*Potter's Dwarris,* 654.) (*b.*) But chapter 80 of the laws of 1853 is not so repugnant to article 2, section 1, that both cannot stand together. 1. Article 2, section 1, gives the right "to vote" at an election. But the right "to vote" is unrestricted so long as there are two persons to be voted for. The definition of the word "vote" is as strictly satisfied where there are but two persons to select from, as when the elector can choose from the world. Under the rule given in regard to repugnancy, where a word is susceptible of both a restricted and an extended meaning, and the restricted meaning will satisfy its definition, it may be used if thereby the two laws can be reconciled. It is true that the statute in question restricts an elector's freedom of choice; but the constitution does not give absolute freedom of choice; it gives a right "to vote at an election," simply. 2. This is more evident from the letter of article 2, section 1. It does not give an elector a right to vote for whomsoever he pleases, but a right to vote "for all officers that now are, or hereafter may be, elective by the people," plainly referring it to the legislature to provide both what offices shall be elective, and what persons shall be eligible thereto. 3. The opposing argument proves too much; it leads to an absurdity. Upon the assumption of absolute freedom of choice, an elector may vote for a Hottentot, or an animal, if he please, and the argument must go that length, or it is good for nothing. It must deny the power to the legislature, because, if the power exists, its exercise is discretionary. (*c.*) The case of *Barker* v. *The People* (20 *John. top of page* 461) is an unanimous adjudication of the late Supreme Court in our favor. (*d.*) The opinion of Chan-

The People *v.* Clute.

cellor Sanford, in the same case on error, (3 *Cowen,* 703,) is not authority against us. 1. It is *obiter;* and it is the opinion of the chancellor alone, not the court; because the question put in the court of errors was always, " shall this judgment be reversed," not " shall this or that opinion be concurred in," and a decision of the Supreme Court is of more authority than an *obiter* expression of opinion by the chancellor. 2. The opinion is partly based upon the ground that the constitution prescribed certain qualifications for all offices, and that having been omitted from the present constitution one half of the reason for the opinion is gone. 3. The decision in this case destroys the chancellor's opinion upon this point; in fact we claim the case as an authority in our favor. The case was upon the act which prohibited any one convicted of dueling from being elected to office. Chancellor Sanford says, the legislature has no power to prescribe qualifications for office; but the constitutional grant of " legislature power" has given authority to the legislature to punish crime, and as such punishment it may provide that one cannot be elected to office. But if the power to punish crime comes only from the grant of legislative power, and as an incident of that grant the legislature may prescribe a qualification for office in one instance, it may also prescribe it in another. It follows, therefore, that the grant of legislative power is stronger than the grant of the right of suffrage, and controls that grant, and the prescription of a qualification being an exercise of legislative power, the decision destroys the statement in Chancellor Sanford's opinion. It is an authority against the grant of freedom of choice to the electors, for another reason. The claim that the legislature cannot impose a qualification for office does not rest upon any one's right of eligibility to the office, but upon an elector's right to vote for whom he pleases. Admitting that the legislature can punish Barker for crime, that does not give it the right to take away my constitutional fran-

chise to vote for Barker, under pretense of punishing him. That would be inflicting punishment upon me. You take nothing from Barker, for he had no right before; but you take from me my freedom of choice. Therefore, this decision can be supported only upon the theory that an absolute freedom of choice is not given to an elector by the constitution. (*e.*) The statute in question is directly authorized by article 10, section 2, "all county officers whose election or appointment is not provided for in the constitution, shall be elected by the electors of the respective counties, or appointed by the boards of supervisors, or other county authorities, as the legislature shall direct." We claim that this section, under the authorities, should be construed as if it read, "shall be elected by the electors of the respective counties as the legislature shall direct." It has been held that the offices and powers referred to in this section were vested by legislative authority, and not by irrevocable constitutional grant; that the legislature has authority to arrange the distribution of such powers as the public exigencies may require, apportioning them to local jurisdictions to such an extent as the law-making power deems appropriate; that this is a continuing legislative power, by virtue of which such powers may be resumed and vested in other authorities; and that the legislature is the sole judge of such public exigencies, "otherwise," said Mr. Justice Denio, "we should have an impossible government." (*The People* v. *Shepard*, 36 *N. Y.* 285. *The People* v. *Pinckney*, 32 *id.* 377. *The People* v. *Draper*, 15 *id.* 544.) Subject to the restriction that the appointment shall remain in the county authorities, the legislature may do what it please. (*Devoy* v. *The Mayor &c.*, 36 *N. Y.* 449.) Prescribing qualifications is at worst only altering the appointing power, which is expressly authorized. So that in this view, the law in question is constitutional, even if we admit that, generally, restrictions are in conflict with article 2, section 1.

The People *v*. Clute.

VI. A supervisor was ineligible at the adoption of the constitution, and its restrictive provisions are prospective only. (*The People* v. *Denniston*, 23 *N. Y.* 247.)

VII. The judgment should be modified by declaring. Furman entitled to the office; in other respects affirmed, with costs of the trial and of the appeal.

*J. S. Landon*, for the defendant.

I. The court erred in holding that the acts of 1829, (*ch*. 352,) and of 1853, (*ch*. 80,) are constitutional and valid. The judge, at circuit, hastily disposed of the objections to the constitutionality of the acts, by asserting that the objections made did not apply to the case. The defendant reasserts them and asks that they may be carefully considered. Chapter 80, laws of 1853, page 115, is unconstitutional. 1. It impairs the right of suffrage, because it restricts the right of the elector to select and vote for a candidate from the whole body of electors. The right of suffrage is guarantied by the constitution. Section 1, article 2, provides that the elector shall be entitled to vote "for all officers, that now are, or hereafter may be, elective by the people." By common consent and universal usage the constitution is so construed that all electors, not disqualified by the constitution itself, are eligible to any office. (*Barker* v. *The People*, 3 *Cowen*, 686.) Limitations upon eligibility to office are prescribed by the constitution itself. Thus : The governor must be thirty years of age, and five years a resident of the State. (*Art.* 4, § 2.) State engineer and surveyor must be a practical engineer. (*Art.* 5, § 2.) Justices of sessions must be justices of the peace. (*Art.* 6, § 15.) Judges ineligible to other offices. (*Art.* 6, § 10.) Sheriffs ineligible to re-election. (*Art.* 10, § 1.) Members of the legislature ineligible to certain offices. (*Art.* 3, § 7.) Can it be claimed that any person constitutionally eligible, can be rendered ineligible by an act of the legislature ; that what the constitution permits, the

legislature may deny?   The power of the legislature to interfere with suffrage in any case is derived from the constitution itself, and is limited to the following cases: "Laws may be passed excluding from the right of suffrage all persons who have been or may be convicted of bribery, larceny," &c.   (*Art.* 2, § 2.)   "Laws shall be made for ascertaining by proper proofs the citizens who shall be entitled to the right of suffrage, hereby established." (*Art.* 2, § 4.)   It is clear from these provisions, that it was the intent of the framers of the constitution to place the right to suffrage above and beyond legislative interference.   The power to interfere with suffrage has manifestly been denied to the legislature, except in the cases specified in the instrument itself.   This becomes the more apparent when we reflect that this is a government by the people; that the constitution was established to secure the blessings of freedom.   (See preamble to State constitution.) The right of suffrage, according to our polity, lies at the foundation of our government.   Our theory is, that the constitution did not confer it, because it inhered in the body politic anterior to any written constitution, but the constitution secured it from loss, restriction or invasion. Now if the legislature may say that the citizen elector shall not vote for a supervisor, it may also say that the citizen shall not vote for any other specified class of electors.   It may say that no man shall be eligible to any office except the son of the incumbent, and thus secure, under the forms of republican government, fruits of hereditary government.   If the legislature may deny eligibility to one, it may to another; to a few, equally so to many; and thus the elector would, in effect, by comprehensive restricting acts of the legislature, be deprived of the right "to vote for all officers, elective by the people."   For of what value is the constitutional right to vote, if the legislature may so restrict and hedge it about, as in effect to deny to the elector freedom of choice.   2. The act of 1853

is unconstitutional, because it denies to the defendant eligibility to office, which the constitution permits. The case of *Barker* v. *The People,* (3 *Cowen,* 686,) in court of errors, sustains and illustrates the above principles, and is relied upon as decisive of the case at bar, in view of the fact that the defendant has been guilty of no crime. (*See also matter of John Foley,* 39 *How.* 356.) The court at circuit sought to evade the force of the above objections, by making these extraordinary and unsupported assertions. "The acts complained of restrict no elector in his vote." It is answered, but for that act the people had the right to vote for the defendant. "Deprive no citizen of any right or privilege secured to him." But for that act the defendant was secure in the privilege of eligibility by permission of the constitution, to the office to which the voice of the people called him. "The offices of supervisor and superintendent were created by statute, and the legislature had the power to declare the holding of one incompatible with holding the other." It may be that the office of supervisor was created by statute, but it is three times mentioned in the constitution, so that its framers were not ignorant of its existence. But both offices are constitutionally made elective by virtue of article 10, section 2. The option was given by the constitution to the legislature to make them elective or appointive, and there is no power conferred by the constitution upon the legislature to deny to any citizen or officer eligibility to the one or the other. Having constitutionally made the offices of superintendent elective, whatever rights the constitution vests in the elector, respecting "all offices elective by the people," vests in respect to this office. The legislature exercised a constitutional right in creating an office and making it elective, but to say it may therefore impose an unconstitutional restriction upon the citizens respecting it, is a consequence not plainly perceived. The inhibition is not against the citizen but against the

The People *v.* Clute.

office." To the defendant who is sought to be ousted from office, to which the people called him, these words seem delusive. It is not unlike telling a man who has been hit by a club, that the force of the blow has been sustained by the club, not by his head. The argument of the court below showing the wisdom of the legislation has no force, if the legislature had not the power to so legislate.

II. The defendant was not ineligible, for the reason that he was not a supervisor of a town, but of a ward of a city. The act of 1853 being a disabling act must be construed strictly, and the defendant not falling within the letter of the act, does not fall within the act itself. The law cannot be strained to impose a penalty or disability beyond what its letter will warrant. (1 *Black. Com.* 92, *marg. Potter's Dwarris*, 245.) The expression of a town supervisor is the exclusion of a city supervisor. *Expressio unius exclusio alterius.* It claimed that the charter of Schenectady (*Laws of* 1862, 661, § 8) subjects the defendant to the same disabilities as a town supervisor. It provides that the supervisors of the city "shall be subject to all the provisions of law applicable to supervisors of towns, except as limited by this act or inconsistent therewith." The manifest object of this act is to define the duties of supervisors of the city. It is an enabling, not a disabling act. It is equivalent to saying that, in the performance of their duties, the city supervisors shall be subject to all the provisions of law, &c. Whether the defendant falls within the disability imposed by the act of 1853, is at least a matter of reasonable doubt, and the defendant is entitled to the benefit of that doubt. (*Chase* v. *N. Y. Cent. R. R.*, 26 *N. Y.* 523. *Potter's Dwarris*, 245, *note. Id.* 251, 255.)

III. It is denied that there is any law imposing a disability upon the defendant. Chapter 80, laws of 1853, page 115, reads as follows : "Sec. 1. Section 23, of chapter 20,

The People *v.* Clute.

title 1, of the first part of the Revised Statutes, 4th edition, is hereby amended so as to read as follows : Sec. 23. No supervisor of any town shall be elected to hold the office of superintendent of the poor." The Revised Statutes were not thereby amended, for the reason that no such Revised Statutes existed. The law sought to be amended forms no part of the Revised Statutes, and never did. Chapter 352 of the laws of 1829, which provides that no supervisor shall be appointed superintendent of poor, never formed part of the Revised Statutes. That act was not amended, because not referred to. The act of 1853 shows an intent to amend a pre-existing law, not to enact a new law. "The Revised Statutes, 4th edition," is a private compilation of two gentlemen. So far as it truly transcribes the Revised Statute, such transcript may be read in evidence. (*Ch.* 359, *Laws of* 1830, *p.* 53, 3*d Edm. ed.*) Their interpolation of other matter into the text of the Revised Statutes could not give such interpolation legislative sanction. The amendment of 1853, therefore, falls, because it has nothing to attach to. To amend a statute which does not exist, is absurd. To amend the act of 1829, without at all referring to it, is equally absurd. Whether it is the duty of the court to sanction legislation of such gross looseness is a matter of doubt, of such gravity as to be deemed reasonable, and the defendant is clearly entitled to the benefit of the doubt. "Where clauses inflicting pains and penalties are ambiguous, or obscurely worded, the interpretation is ever with the subject, for this plain reason, that the legislature is ever at hand to explain its own meaning, and to express more clearly what has been obscurely expressed." (*Hebbard* v. *Johnson*, 3 *Taunt.* 177. *Potter's Dwarris*, 251.)

IV. The relator cannot claim to be elected. The law, if valid, does not declare the votes cast to be void, as in the cases mentioned in the constitution. (*Art.* 6, § 10. *Art.* 3, § 7.) No proof was offered that any voter knew

The People *v.* Clute.

that the defendant was a supervisor, or disqualified.  The finding of fact (not excepted to) is that the voters did not know of his ineligibility.  Surely a finding tending to destroy the highest privilege of a citizen—suffrage—should be based upon affirmative evidence.  Our laws provide that the person receiving the greatest number of votes shall be elected.  This number the relator did not receive. It is submitted, as conclusive upon this point, that the election was not (granted the validity of the law) void *per se;* it was only voidable, upon an action like this, in the nature of a *quo warranto.* "Due process of law," i. e., a trial by a competent court, must first be had before the defendant's ineligibility could be affirmed as a fact. (*Wynehamer* v. *The People,* 13 *N. Y.* 378, 392.)  On the day of the general election the defendant's ineligibility could not, therefore, be affirmed as an adjudged fact.  The defendant had not then had his day in court, to be heard in the case.  The voters surely could not be bound to take notice of a fact which might never be adjudged a fact, and could not be, until the defendant had been heard in court to make his proofs and allegations against it. The votes cast for the defendant in the fifth ward were therefore not void, only voidable.  Not being void, they could not be thrown out, or rejected.  The relator therefore did not receive the highest number of valid votes. Had the law declared the votes cast for the defendant void, it is possible a different rule would obtain.

V. The judgment should therefore be reversed so far as it ousts the defendant from the office, and his title thereto should be asserted, and affirmed so far as it declares the relator not elected thereto.

*By the Court,* PARKER, J.  This action was brought to oust the defendant from the office of superintendent of the poor for the county of Schenectady, and to put the relator in his place.

The People *v.* Clute.

The facts found by the court at special term, are as follows:

"At the general election in 1871, the office of superintendent of the poor was to be filled by the electors of the county of Schenectady.

The relator, Furman, and the defendant, Clute, were both candidates for said office, and were voted for by the electors. The whole number of votes was 4676, of which Clute received 2448, and Furman 2228, (which gives Clute 220 majority.)

Of the votes given for Clute 295 were given in the fifth ward of the city of Schenectady, which then constituted one election district. Clute was declared elected, and having filed his official bond and taken the oath of office, he, on the 1st of January last, entered into said office and still continues therein.

At a city election held in April, 1871, said Clute was duly elected supervisor of the fifth ward, accepted the office and discharged its duties until the 12th day of December last, when he resigned.

Previous to January 1st, 1872, the said Furman took the oath of office and tendered and deposited with the county clerk a bond in due form and sufficiency as superintendent of said county, and claimed the said office.

There was no proof of actual notice of Clute's ineligibility to any of the electors of said county, nor proof of any facts from which notice could be implied, other than his holding the office of supervisor of the 5th ward."

From these facts the court concluded that the election of Clute was void, and conferred upon him no title to said office, and that, inasmuch as no notice to the whole body of electors of Clute's ineligibility was shown, the election was a failure, and neither of the candidates acquired title to the office. Judgment was ordered and subsequently entered against the defendant Clute, ousting him from the office, and adjudging that Furman was not entitled thereto,

and denying costs to either party. From this judgment both parties have appealed. The ground of the decision that Clute was not eligible to the office is, that being supervisor of the 5th ward of the city of Schenectady he was debarred from holding that of superintendent of the poor, by chapter 352 of the laws of 1829, chapter 80 of the laws of 1853, and chapter 385, title 4, § 8, of the laws of 1862.

The first of these statutes is as follows: "No supervisor of any *town*, or county treasurer shall be *appointed* to hold the office of superintendent of the poor of any county in this State."

This provision was incorporated into an edition of the Revised Statutes, called the fourth edition, as section 22 of chapter 20, title 1 of the 1st part thereof, and it was amended by chapter 80 of the laws of 1853, as follows: "Section 22 of chapter 20 of title 1 of the 1st part of the Revised Statutes, fourth edition, is hereby amended, so as to read as follows: '22. No supervisor of any town or county treasurer, shall be *elected* or appointed to hold the office of superintendent of the poor.'" There can be no doubt that this was an effectual amendment of the provision of law thus incorporated into the Revised Statutes, because there can be doubt of the identity of the provision intended to be amended, and whether it was, in fact, a part of the Revised Statutes, is of no consequence.

By the charter of the city of Schenectady, (*Laws of* 1862, *ch.* 385,) it is enacted that the supervisors, provided to be elected or appointed under this act, shall be *subject to all the provisions of law* applicable to those officers, in the several towns of this State.

It follows that the defendant, supervisor of a ward in that city, was ineligible to the office of superintendent of the poor.

It is strenuously contended, however, by the learned counsel for the defendant, that the statutes of 1829 and

The People *v.* Clute.

of 1853, above quoted, are unconstitutional; that it is not competent to the legislature to restrict the eligibility to office.

In examining the question of the constitutionality of a statute, it is necessary to keep in mind the fundamental principle in regard to the power of a State legislature, that to it is committed by the people "the whole law making power of the State, which they have not expressly or impliedly withheld. Plenary power in the legislature, for all purposes of civil government, is the rule, a prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its validity, to show that it is forbidden." (*People* v. *Draper*, 15 *N. Y.* 543.) There is in the constitution of this State no general provision in regard to eligibility to office, and no express restriction upon the legislature touching that subject. The doctrine insisted upon that the legislature has no power to place any restriction upon eligibility to office is drawn from the guaranty in subdivision 1, article 2 of the constitution, of the right to every male citizen, possessing certain qualifications, "to vote for all officers that now are or hereafter may be elective by the people." It is said that if the legislature may deny eligibility to one, it may to such others as it may choose, and so restrict the right of suffrage in respect to the officers elective by the people, that such right of suffrage will be unconstitutionally limited.

This, it will be seen, is no restriction upon the right guarantied, which is the right to *vote*, not to be voted for. True, if the legislature should take away eligibility from all persons for whom the electors could vote, that would be taking away his right to vote and would be unconstitutional. But it by no means follows that it is unconstitutional to declare a single class of persons for whom he could vote, ineligible.

The right which the constitution guaranties to him is

not thereby interfered with. He may still vote "for all officers elective by the people."

No doubt the absence of any restriction upon the legislature, leaves that body in possession of great power for evil, in the way suggested by the counsel. Still, as the people have given to the legislature all legislative authority, without excepting the power to declare who shall be eligible to office, it is not a function of the courts to make the exception. In the language of Senator Verplanck, (20 *Wend.* 382,) adopted by Johnson, J., in *Wynehamer* v. *The People* (3 *Kern.* 413,) "It is only in express constitutional provisions, limiting legislative power and controlling the temporary will of the majority by a permanent and paramount law, settled by the deliberate will of the nation, that I can find a safe and solid ground for the authority of courts of justice to declare void any legislative enactment."

I am unable to see how the act of the legislature, providing that no supervisor shall be elected to hold the office of superintendent of the poor, is unconstitutional.

The court, at special term, correctly held that the defendant was ineligible, and the judgment ousting him from the office was right.

The next question is, was Furman legally elected and entitled to the office?

This was decided in the negative by the court below, on the ground that there was no proof that the electors who voted for Clute had notice of his ineligibility.

There is no doubt that a vote given for an ineligible candidate is to be counted, and not deemed thrown away, if the voter is not chargeable with notice of the ineligibility.

Doubtless the voters of the 5th ward, of which the defendant was supervisor, were chargeable with such notice. This is not denied, but it was held that, in order to give effect to the vote for Furman, as being the majority, and

The People *v.* Clute.

sustain his election, it was necessary that all who voted for Clute should be chargeable with the notice that none of the votes given for Clute could be thrown out unless all were, and that Furman, therefore, did not receive a majority of the votes to be counted, and the result was, that as Clute, who did receive the majority, was ineligible, no one was elected.

In this, I am inclined to think, the court erred.

I see no difficulty in separating the votes given for Clute in the 5th ward from those given for him in the rest of the county. These 295 voters in the 5th ward had notice of his ineligibility, the others had not. There is no difficulty, in practice or in principle, in throwing out these 295 votes, while the others are retained and counted. The voters in the 5th ward who voted for Clute, knowing his incapacity to take and hold the office, did no more than if they had voted in blank, voted for no one; that is, had not voted at all; and this is the case with each voter individually who. thus voted. That others voted for Clute, supposing him eligible, can have no effect on the vote of one knowing him ineligible, and *vice versa.* In *The King* v. *Hawkins*, (10 *East*, 211,) Hawkins and Spicer were candidates and were voted for, for the office of alderman of the borough of Saltash. After two votes had been given for each, it was found, and publicly proclaimed, that Hawkins was ineligible to the office. After notice thus given twenty votes were given for Hawkins, by voters, all but two or three of whom had notice of his ineligibility, and sixteen for Spicer; and it was held that all the votes given for Hawkins after such notice to the voters who gave them, were thrown away, and Spicer was held duly elected. Lord Ellenborough said: "The general proposition that votes given for a candidate, after notice of his being ineligible, are considered the same as if the persons had not voted at all, is supported by the cases of *The Queen* v. *Boscawen, Easter,* 13 *Anne; The King* v.

*Withers, Easter,* 8 *G.* 2; *Taylor* v. *Mayor of Bath, M.* 15, *G.* 2; all which are cited in *Cowper,* 537, in *The King* v. *Monday.*

"Is there any solid distinction between the cases I have alluded to, as establishing the general proposition, and the present case, on account of the notice of the disqualification of Hawkins having been given after two persons had voted? We think there is not; there still remained thirty-six persons to vote, of whom only sixteen voted for Spicer and twenty voted for Hawkins. Although we are not prepared to say that if the notice had been given in a more advanced stage of the poll, it would have made any difference, provided the number of votes given for Hawkins, without notice of his incapacity, had not been equal to those given for Spicer. Spicer having been, therefore, in our opinion, duly elected into the office of alderman, and having been sworn in before two aldermen who have, by the charter, authority to administer the oath, the office was legally filled up and enjoyed by him." And the judgment in this case was afterwards affirmed in the house of lords. (2 *Dow,* 124.)

Other cases are cited by the plaintiff's counsel, holding the same doctrine in regard to the propriety of throwing out such part of the votes as are affected by the notice, and retaining such as are not, but we are pointed to no case which denies such propriety.

The defendant's counsel, however, argues that, inasmuch as the statute, under which the defendant is ineligible, does not declare votes cast for him void, they are voidable, and therefore a judgment declaring him ineligible was necessary before the fact could be deemed established, and that hence the voters were not bound by the notice of such fact.

The authorities do, in effect, make all votes cast for an ineligible person, with notice of the fact, void, when they declare them, as in *The King* v. *Hawkins, (supra,)* wholly

The People *v.* Clute.

inoperative as votes, the same as no votes, and hold that to produce such effect, notice only, and not adjudication of the fact is necessary.

If the 295 votes which should have been thrown out are not counted, a majority of seventy-five is left for Furman, and he was elected, and should have had judgment in his favor to that effect.

The plaintiff claims that the judgment is also erroneous in not giving costs to the plaintiff.

By section 304 of the Code, it is provided that costs shall be allowed, of course, to the plaintiff, upon a recovery, "In the actions of which a court of a justice of the peace has no jurisdiction," and in several other cases therein mentioned, not bearing upon the question here.

By section 306 it is provided that " in other actions costs may be allowed or not, in the discretion of the court."

The latter provision has been confined to equity cases, of which the case at bar is not one. (*Staiger* v. *Schultz*, 3 *Keyes*, 614.)

In this case the relief sought was a judgment of ouster against the defendant, and a further judgment that the relator, Furman, was entitled to the office.

The judgment recovered was one of ouster of the defendant merely, and as to the further relief demanded, it was denied. Still the plaintiff recovered a judgment, and as the action was not one cognizable before a justice of the peace, he was, by virtue of section 304 of the Code, entitled to costs.

The judgment, therefore, in so far as it adjudges that said defendant, Harrison Clute, be ousted from the office of superintendent of the poor of the county of Schenectady, mentioned in the complaint, in this action, must be affirmed.

And, in so far as it adjudges, that the said plaintiff, Henry A. Furman, is not entitled, by virtue of the election mentioned in the complaint, to the said office of superin-

The People *v.* Green.

tendent of the poor, it must be reversed, and judgment must be entered, adjudging that the said plaintiff, Furman, is entitled, by virtue of the said election, to the said office, and that the plaintiff recover, against the defendant, the costs of the action and costs of the appeal.

[THIRD DEPARTMENT, GENERAL TERM, at Binghamton, September 3, 1872. *P. Potter, Parker* and *Daniels,* Justices.]

---

THE PEOPLE, *ex rel.* Mark M. Pomeroy, *vs.* ANDREW H. GREEN and others, constituting the board of apportionment and audit.

The act of 1872 (*ch.* 375, § 2) requires the comptroller of the city of New York, " to allow and pay the bills of the several proprietors of the newspapers in said city and county for all city and county advertising *actually done* prior to January 1, 1872." *Held* that it was not the effect of this provision to legalize all previously illegal demands, and to require the payment of the bills of mere volunteers, the same as those of persons publishing under legal authority ; and there was nothing in the act demanding such an interpretation.

That the object of the statute, so far as the newspapers were concerned, evidently was to provide an appropriate procedure, with an adequate fund, for the speedy liquidation and payment of all strictly legal obligations, and also of all just and honest claims of an equitable, if not of a technical legal character.

That there was the fullest intention of providing for publishers who had acted under legal authority, or at least in good faith under color of such authority, but none of presenting any part of the public funds to those who had acted in violation of law, and without a shadow of authority.

*Held, also,* that as to claims for services done apparently without any contract express or implied, and without any legal authority, or even official request, the allowance of such claims would be pure gratuity, and the court would not, by *mandamus*—a writ which only issues in cases of unquestionable legal right—direct the board of apportionment and audit even to consider them.

But that where services were performed under color of legal authority, and were beneficial to the city, and necessary, they came within the provisions of the act of 1872 ; and that a mandamus would be issued, directing such board to audit and allow the bills for such services.